# ALVIN LEON ANDERSON *v.* STATE OF MARYLAND

[No. 130, September Term, 1977.]

*Decided June 7, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Robert S. Sherman* for appellant.

*F. Ford Loker, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

The petitioner, Alvin Leon Anderson, protests the pretrial denial of his motion to suppress evidence, the introduction of which resulted in his conviction in the Criminal Court of Baltimore of a handgun violation. Md. Code (1957, 1976 Repl. Vol.), Art. 27, § 36B (b). The handgun was discovered when police officers investigating a robbery committed six days earlier by two black males, one tall and one short, without any preliminary inquiry stopped and frisked two black males, one of whom — the petitioner — was three to five inches shorter than the other. The two when stopped were walking in a neighborhood allegedly frequented by one of the robbers, and had looked back several times at an unmarked police car which had just cruised past them. Since this intrusion by the police was "based on nothing more substantial than inarticulate hunches," *Terry v. Ohio,* 392 U. S. 1, 22, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), it was unreasonable, exceeding the very narrow exception to the probable cause requirement allowed by *Terry* in street confrontations between a citizen and a policeman investigating observed suspicious behavior; the handgun recovered from Anderson in the course of the search should thus have been excluded from evidence at his trial.

The relevant facts have been agreed upon by the parties pursuant to Maryland Rule 828 g and may be briefly stated. On August 25, 1976, Officer Claude Merritt of the Baltimore City Police Department interviewed one Edward Royster, a victim of one of a number of robberies that had occurred in the area of the Mondawmin Shopping Center. Royster said that he had been robbed almost a week before by a "Mutt and Jeff" team of two black males, the smaller of whom had a chrome-plated pistol which he had carried inside a paper bag, and that one of the men "hung around" Warwick and North Avenues in Baltimore City. At about 12:30 p.m. that day, Officer Merritt and two other policemen, all in plain clothes, were cruising that area in an unmarked car, and observed a group of black males standing on a street corner one block south of the intersection of Warwick and North Avenues. As

the officers were driving past, two of the men, one taller than the other, left the group and walked in a northerly direction, looking back a number of times toward the unmarked police car and in the general direction of the group they had just left. Officer Merritt turned the car around and pulled up next to the petitioner and his companion; the three officers got out of the car "to stop and frisk the [petitioner]." Officer Merritt then noticed for the first time that Anderson was holding a brown paper bag, which one of the officers told him to put down on the car; when he complied the policemen heard a metallic thump or click. After the pat-down, Officer Merritt opened the paper bag and found a chrome-plated revolver, whereupon he placed petitioner under arrest. No inquiries of any kind were addressed to the petitioner before he was frisked, though Officer Merritt testified that he did tell Anderson the reason for stopping the pair — *i.e.,* that they fit the description of the robbers being sought.

As it developed, the petitioner and his companion were not in fact the persons who had robbed Mr. Royster, as the police very shortly discovered; however, Anderson was tried and convicted on the handgun charge by Judge Grady, sitting without a jury. The judge refused to suppress the gun and paper bag seized at the time of petitioner's arrest, concluding that the police had a reasonable ground to believe the two men could be involved in the Royster robbery and that they were thus legitimately stopped for an interview; given that the police had "some reason to believe" the paper bag had concealed a weapon in the Royster case, the metallic noise which occurred when the bag was put down engendered probable cause for believing that the petitioner was carrying a weapon. The Court of Special Appeals, in an unreported per curiam opinion, affirmed the conviction, though its reasoning took a somewhat different tack. That court concluded that the frisk prior to questioning was permissible under *Terry* (a question the trial court found irrelevant), since the police, when they saw two men "fitting the description in the specified area, and one of them was carrying a paper bag,"[1]

---

1. The agreed statement of facts, which is supported by the record, indicates that the police officer did *not* notice the paper bag until after the men had already been forcibly detained.

were "completely justified in believing the men were armed." The Court went on to reason that because the paper bag was within the "lunge, reach, or grasp" of the petitioner, the search of the bag was also permissible. We granted certiorari.

Since our resolution of the petitioner's contention that the forcible stop here "under any theory of law . . . was unreasonable"[2] is bounded by the principles announced by the Supreme Court in *Terry v. Ohio,* 392 U. S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), we turn first to a perusal of that decision. *Terry* dealt with the very narrow question of whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons when there is no probable cause to arrest him. 392 U. S. at 15. Answering that question in the negative, the Court preliminarily rejected the notion that such investigatory detentions were not governed by the fourth amendment to the Federal Constitution. The Court observed that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person," *id.* at 16, and that exploration of the outer surfaces of a person's clothing is a "serious intrusion upon the sanctity of the person . . . and . . . not to be undertaken lightly." *Id.* at 16-17. The central inquiry is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Id.* at 19. In determining whether the intrusion was justified at its inception, "the police officer must be able to point to specific and articulable facts which, taken together

---

2. Anderson argues that the gun discovered by the police when they stopped him was not admissible in evidence because certain provisions of this State's handgun control law, Md. Code (1957, 1976 Repl. Vol. & 1977 Cum. Supp.), Art. 27, §§ 36A-36F, were not followed. The law allows a police officer to frisk a person he reasonably believes may be carrying a handgun in violation of section 36B (b) of the statute, but only after the officer has asked for the person's name and like information and has requested "such explanations as may be reasonably calculated to determine whether the person is, in fact, unlawfully wearing, carrying, or transporting a handgun . . . ." *Id.* § 36D (a). There is no question but that the police did not comply with the provisions of the statute; however, in view of our determination that there were no reasonable grounds upon which the police were entitled to forcibly stop Anderson — whether for investigation of a possible violation of the handgun statute, for inquiries about the Royster robbery, or for any other reason — we do not reach the question of the effect of the police officer's noncompliance with section 36D (a).

with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. The reasonableness of an intrusion is to be assessed against an objective standard—whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.* at 21-22.

In *Terry,* there was no question of the propriety of the officer's taking steps to investigate the accused's suspicious behavior,[3] and the crux of the case was the justification for the search in the course of that investigation. *Id.* at 23. That justification was provided by the officer's reason to believe he was dealing with an armed and dangerous individual who thus posed a threat to his safety while he was investigating. *Id.* at 27-28. Under those circumstances, a limited search of the suspect's outer clothing for weapons was permissible. The Court's holding was very narrowly circumscribed:

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in

---

3. The Court's observations with regard to the circumstances in *Terry* are of particular interest:

> There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined i; ne of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. [392 U. S. at 22-23.]

> the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. [*Id.* at 30.]

This language makes clear that the real thrust of *Terry* is directed at instances in which there is reasonable suspicion that someone is about to commit or has just committed a crime. *See Adams v. Williams,* 407 U. S. 143, 153, 92 S. Ct. 1921, 32 L.Ed.2d 612 (1972) (Brennan, J., dissenting). Indeed the majority in *Terry* noted: "[W]e deal here with an entire rubric of police conduct — *necessarily swift action predicated upon the on-the-spot observations of the officer on the beat* — which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." 392 U. S. at 20 (emphasis added). The rationale underlying *Terry* is hardly so potent where, as here, the crime is six days old and there is no perceptible reason why further surveillance and investigation could not be undertaken, rather than immediately precipitating a street encounter with its concomitant danger to the officers and intrusion upon the personal security of citizens. Notably, Mr. Justice Harlan suggested in a companion case decided the same day as *Terry* that an important factor to be taken into account in determining whether there are reasonable grounds for a forcible intrusion is whether there is any need for immediate action. *Sibron v. New York,* 392 U. S. 40, 73, 88 S. Ct. 1889, 20 L.Ed.2d 917 (1968) (concurring opinion).

In the present case, unlike *Terry,* the facts simply did not justify the initial forcible investigatory stop[4] nor, perforce, did they permit a reasonable inference that Anderson was armed and dangerous. It is simply not open to question that the officers in this case had *not,* unlike the situation in *Terry,* "observed enough to make it quite reasonable to fear that [the petitioner or his companion] were armed . . . ."*Id.* at 28.

---

4. The forcible stop here was contemporaneous with the search and preceded any inquiry of any kind; indeed Officer Merritt testified that this was his habit.

As the Court said in *Sibron v. New York, supra,* 392 U. S. at 64:

> The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.

Here, there were *no* facts from which it could be reasonably inferred that Anderson was the person the police officers were seeking, and hence that he was armed and dangerous. To arrive at such an inference from the tenuous facts that a tall and a short black man are seen together leaving a group, six days after a robbery committed by a tall and a short black man, in a neighborhood one of the alleged robbers is said to frequent, even when coupled with the fact that they looked back several times toward an unmarked police car, is wholly unreasonable. Indeed, to say that such facts constitute "reasonable suspicion" would be perilously close to entitling a policeman "to seize and search every person whom he sees on the street." *Id.* The police behavior here presents the very paradigm of the "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio, supra,* 392 U. S. at 27.[5]

---

5. Factors deemed relevant to a determination of reasonable suspicion to stop include the character of the area where the stop occurs, the temporal or spatial proximity of the stop to a crime, and the appearance or conduct of the suspect. Typically, courts face some combination of these factors in adjudging reasonable suspicion. [Note, *The United States Courts of Appeals: 1976-1977 Term Criminal Law and Procedure,* 66 Geo. L.J. 203, 290 (1977) (footnotes omitted).]
Here, the officer's "reasonable suspicion" was based on the third factor alone — the appearance (a tall and a short man) and conduct (looking back at the unmarked police car which had just passed them) of the suspects. While obviously the appearance and conduct of a person could alone engender "reasonable suspicion," the tenuousness of such a basis for suspicion here is readily apparent.

We do not say that the officers could not have directed some inquiries to Anderson and his companion, and we need not address the question of what police behavior would have been appropriate had the pair declined to stop or respond to such inquiries. That is not this case. We think it clear that here the officer was not entitled to make a forcible stop[6] and had no reason to believe the petitioner was armed and dangerous. Consequently, the search was unjustified and its fruits must be excluded. To conclude otherwise would invoke "the specter of a society in which innocent citizens may be stopped, searched, and arrested at the whim of police officers who have only the slightest suspicion of improper conduct." *Adams v. Williams,* 407 U. S. 143, 162, 92 S. Ct. 1921, 32 L.Ed.2d 612 (1972) (Marshall, J., dissenting). That is a course we must decline to take.[7]

Since the evidence used to convict the petitioner was obtained in violation of his fourth amendment right to be free from unreasonable searches and seizures, the judgment of

---

**6.** We suggested in State v. Wilson, 279 Md. 189, 200, 367 A. 2d 1223, 1230 (1977), that the Supreme Court may have expanded the narrow exception established in *Terry* and *Sibron* in Adams v. Williams, 407 U. S. 143, 92 S. Ct. 1921, 32 L.Ed.2d 612 (1972), by applying less stringent requirements to justify the initial forcible stop. In *Adams* the Court held that information received from an informant known to the police officer that a certain individual was carrying narcotics and had a gun justified the officer's forcible stop of that individual. Even *Adams,* however, can by no stretch of the imagination be said to expand the *Terry* exception to encompass the facts of this case. See *also* Pennsylvania v. Mimms, 343 U.S. 106, 98 S. Ct. 330, 54 L.Ed.2d 331 (1977) (order to driver, lawfully detained for a traffic violation, to get out of car not an unreasonable seizure, and police justified in conducting limited search for weapons when bulge was observed under driver's jacket).

**7.** Our conclusion that the forcible seizure and search of the petitioner was unjustified makes it unnecessary for us to decide whether the Court of Special Appeals was correct when it determined, in consonance with precedent from that court, *see* Williams v. State, 19 Md. App. 204, 212-14, 310 A. 2d 593, 598-99 (1973), that the search of the paper bag was permissible since it was within the "lunge, reach, or grasp" of the petitioner. We thus specifically reserve the question whether the standard governing the scope of a search incident to an arrest, *see* Chimel v. California, 395 U. S. 752, 762-63, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969), also governs a protective search for weapons, where the detention is contemplated to be only temporary and the search is initiated only for protective purposes.

the Court of Special Appeals affirming his conviction must be reversed.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court with instructions to reverse the judgment of the Criminal Court of Baltimore and award Alvin Leon Anderson a new trial.*
>
> *Costs to be paid by the Mayor and City Council of Baltimore.*