765 A.2d 612

**Glen Keith STOKES**

v.

**STATE of Maryland.**

**No. 107, Sept. Term, 1998.**

Court of Appeals of Maryland.

Jan. 12, 2001.

408

Julia Doyle Barnhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, and Julia Doyle Barnhardt, on brief), Baltimore, for petitioner.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY,* CHASANOW,** RAKER, WILNER, and CATHELL JJ.

BELL, Chief Judge.

Glen Keith Stokes, the petitioner, was stopped by a Montgomery County police officer within thirty minutes of, and around the corner from where, a robbery had occurred.[1] The pat down search that followed resulted in the recovery of controlled dangerous substances, for the possession of which the petitioner was subsequently tried, convicted and sentenced.[2] Prior to trial, the petitioner moved to suppress the fruits of the search. The Circuit Court for Montgomery County denied the motion. The propriety of that ruling was the only issue presented on appeal to the Court of Special Appeals, which, in an unreported opinion, affirmed the petitioner's conviction and sentence. This Court granted the petitioner's Petition for Writ of Certiorari to consider "wheth-

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

** Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

1. Although the police officer, being unable to recall exactly, testified that approximately fifteen to twenty minutes had elapsed from the time he received the call, the trial court found the stop to have occurred within thirty minutes. Neither the State nor the petitioner has challenged the court's finding and, in fact, both rely on it.

2. The controlled dangerous substances recovered were marijuana and phencyclidine. The petitioner was convicted of possession and possession with intent to distribute marijuana and possession of phencyclidine, for which he received two concurrent three year sentences.

er a police officer's observation of a black man rapidly parking a car and exiting it, around the corner from the location of a robbery thirty minutes earlier, gave him reasonable articulable suspicion that the man was the robber sufficient to detain him and search him, thereby uncovering controlled dangerous substances...." [3] Answering that question in the negative, we shall reverse.

## I.

On February 27, 1997, while parked in a marked police cruiser in a "town house community, residential" parking lot, Officer Mark Hayden heard a lookout for a robbery that had just occurred around the corner from where he was then located. The lookout, which was broadcast at 9:30 p.m., contained neither a height and weight description nor a description of a get-away vehicle. It was for a black male wearing a black tee shirt,[4] but Officer Hayden testified that the look-out was for a "black man wearing a dark top ." Within thirty minutes, the petitioner, who is black, drove into the parking lot, at what the officer described as "a high rate of speed," and parked diagonally across several parking spaces near the officer. Once parked, he immediately shut off the engine and got out of his car. The petitioner was wearing dark clothing, a black leather jacket, dark pants and a skull

---

**3.** The question as presented referenced the search of the petitioner and the recovery of the controlled dangerous substances. This case rises or falls on the stop, for if the petitioner should not have been stopped in the first place, there certainly would not have, nor could there have been, any search. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (initiating the doctrine that derivative evidence gained from the illegal actions of police must also be suppressed as fruits of the poisonous tree); *see also Ott v. State,* 325 Md. 206, 600 A.2d 111 (1992) (noting that physical evidence obtained as the result of an illegal seizure is suppressed under the fruit of the poisonous tree doctrine), *cert. denied, Maryland v. Ott,* 506 U.S. 904, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992).

**4.** This is the description that the Police Department employee who took the 911 call testified that she received from the victim and transmitted to dispatch. Rendering its ruling, the trial court commented that "the description was rather sparse, black male, and nothing else."

cap. The officer testified that he believed the petitioner to be a "close match" to the lookout and, so, detained him and patted him down. Upon feeling a bulge consistent with a bag of "vegetable matter," the officer inquired as to its contents. When the petitioner replied that it was "weed," the officer removed the bag, observed what he suspected to be marijuana, and arrested the petitioner. A subsequent "search incident to the arrest"[5] uncovered marijuana-laced PCP in the petitioner's pocket and in his car.

The petitioner moved to suppress the evidence recovered in the search. Finding that "the stop was justified, the intrusion was justified, [and] the brief inquiry as to the nature of the substance that the officer felt that he believed to be marijuana were all appropriate," the Circuit Court denied the motion. Affirming, the Court of Special Appeals reasoned:

"Viewing the court's factual findings in the light most favorable to the State, we are persuaded that the officer had a reasonable, articulable suspicion that the appellant was involved in the robbery that was relayed by the police dispatch. The trial court found that the stop was made relatively shortly after the robbery occurred, in the same neighborhood as the crime scene. Appellant matched in a general way the description of the perpetrator in that he was a black male in dark clothing. We are satisfied that the officer was justified in making the investigatory stop. With regard to the frisk of appellant's clothing, the court determined that robbery was a type of felony that presents potential for danger. Specifically, the court reasoned that a 'robbery means there was a possible weapon,' and that the exact wording of the dispatch did not exclude the possibility that the perpetrator may have been armed. We agree with the court's observation, and we conclude that the circum-

---

5. Under this exception to the warrant requirement; incident to a lawful arrest, the police may contemporaneously search a person and areas into which he or she might reach to obtain weapons or destroy evidence. *See United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

stances of the stop warranted a reasonable frisk for weapons."

The Court of Special Appeals then upheld the search under the "plain feel" doctrine.[6]

## II.

The petitioner argues that the arresting officer lacked reasonable articulable suspicion to support that the petitioner was the perpetrator of the robbery for which the officer received the look-out. He notes that the robbery had occurred thirty minutes before he was stopped, but only moments away. And, he points out, the robber was reported to have been on foot, wearing a black tee shirt. By contrast, the petitioner observes, he was in a car and wearing a leather jacket. He thus asserts that "even a robber proceeding at snail's pace would have been long gone and [the petitioner] was in a hurry." More telling, he believes, is the unlikelihood that a fleeing robber would select a parking space near a marked police cruiser right around the corner from the crime scene. The petitioner concludes, therefore, that "[t]here was no basis for believing that [he] was [the robber] under any standard, even that of the 'inchoate hunch.'" For this Court to uphold his conviction, he maintains, "would mean that any time there is a lookout for a black male involved in a robbery, for at least thirty minutes afterwards, police officers may stop any black man in the vicinity who is in a hurry and subject him to a forcible detention and frisk."

The State disagrees. As it sees it, the brief detention and pat down of the petitioner is fully consistent with the *Terry* doctrine.[7] It argues that, given that the petitioner "was the

---

6. The "plain feel" doctrine is allowed when "a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent [as contraband], there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons ... [and] its warrantless seizure," is thus justified. *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334, 346 (1993).

7. In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that "whenever a police officer

only person in the immediate vicinity of a recently reported robbery who matched the description given by the victim, and who acted suspiciously," it would have been irresponsible police behavior not to have stopped the petitioner and undertaken "the minimal investigatory action permitted under *Terry*." While conceding that the description of the robber could have been more specific, the State asserts that the description was "sufficient to narrow the class of persons who could be legitimately stopped."

We agree with the petitioner. Viewing the totality of the circumstances, the stop in this case was based on nothing more substantial than a hunch and, thus, the police action exceeded the exception to the probable cause requirement allowed in street confrontations between a citizen and the police investigating observed suspicious behavior. Accordingly, we hold that the petitioner's motion to suppress should have been granted and the fruits of that search excluded from the evidence at his trial.

### III.

On a motion to suppress, while reviewing findings of fact under the "clearly erroneous standard," *Jones v. State,* 343 Md. 448, 458, 682 A.2d 248, 254 (1996); *see also Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999), this Court

accosts an individual and restrains his freedom to walk away, he has 'seized' that person," *id.* at 16, 88 S.Ct. at 1877, 20 L.Ed.2d at 903, and that exploration of the outer surfaces of a person's clothing is a "serious intrusion upon the sanctity of the person ... and ... not to be undertaken lightly." *Id.* at 16–17, 88 S.Ct. at 1877, 20 L.Ed.2d at 903. The central inquiry is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Id.* at 19, 88 S.Ct. at 1878, 20 L.Ed.2d at 904. In determining whether the intrusion was justified at its inception, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. The reasonableness of an intrusion is to be assessed against an objective standard whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.* at 21–22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906 (internal citations omitted).

will review *de novo* the question whether, under those facts, there was reasonable suspicion to make a warrantless search. *See Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990). In so doing, we consider the facts, as they exist on the record, and the reasonable inferences from those facts, in the light most favorable to the State. *See Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 525 (2000); *Ferris,* 355 Md. at 368, 735 A.2d at 497; *In re Tariq A–R–Y,* 347 Md. 484 at 488, 701 A.2d 691 at 693; *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22, 22 (1990). "When the question is whether a constitutional right, such as, as here, a defendant's right to be free from unreasonable searches and seizures, has been violated, the reviewing court makes its own independent constitutional appraisal, by reviewing the law and applying it to the peculiar facts of the particular case." *Jones v. State,* 343 Md. at 457, 682 A.2d at 253. *See also Riddick,* 319 Md. at 183, 571 A.2d at 1240; *State v. Gee,* 298 Md. 565, 571, 471 A.2d 712, 715, *cert. denied,* 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 827 (1984).

■ The Fourth Amendment to the United States Constitution [8] protects against unreasonable searches and seizures, including seizures that involve only a brief detention. *See supra* at n. 7, n. 8, *citing* U.S. Const. amend. IV. *See also Ferris,* 355 Md. at 368, 735 A.2d at 497.

■ A police officer may direct an inquiry to a citizen, even when he or she has no cause for doing so and it may be entirely appropriate for that citizen to decline "to stop or respond to such inquiries." *Anderson v. State,* 282 Md. 701, 708, 387 A.2d 281, 285 (1978). If the officer does nothing more, takes no further action, then no seizure will have occurred. Under the Fourth Amendment, an officer may make a forcible stop of a citizen, however, if the officer has

---

**8.** "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." United States Const. amend. IV. The guarantee is applicable to the states. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

reasonable grounds for doing so. *See Cartnail,* 359 Md. at 285, 753 A.2d at 526; *Jones v. State,* 319 Md. 279, 287–88, 572 A.2d 169, 173 (1990); *Anderson,* 282 Md. at 706, 387 A.2d at 284. In *Anderson,* we were emphatic:

"The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so."

282 Md. at 707, 387 A.2d at 285, *citing Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917, 947 (1968).

This Court has consistently held that mere hunches are insufficient to justify an investigatory stop; for such an intrusion, an officer must have "reasonable articulable suspicion." *Ferris v. State,* 355 Md. at 371, 735 A.2d at 499; *Graham v. State,* 325 Md. 398, 408, 601 A.2d 131, 135 (1992); *Quince v. State,* 319 Md. 430, 433, 572 A.2d 1086, 1087 (1990); *Derricott v. State,* 327 Md. 582, 588, 611 A.2d 592, 596 (1992); *Jones v.. State,* 319 Md. 279, 287, 572 A.2d 169, 173–74 (1990). Thus, an officer must be able to point to specific and articulable facts that warrant the stop. *See Cartnail,* 359 Md. at 284, 753 A.2d at 526; *Ferris v. State,* 355 Md. at 384, 735 A.2d at 506. While there is no litmus test to define the "reasonable suspicion" standard, *see Ornelas v. United States,* 517 U.S. 690, 695, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911, 918 (1996) (noting that it is impossible to articulate, with precision, what "reasonable suspicion" means), it has been defined as nothing more than "a particularized and objective basis for suspecting the particular person stopped of criminal activity," *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981); *see also Ornelas,* 517 U.S. at 695–96, 116 S.Ct. at 1661, 134 L.Ed.2d at 918, and as a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act. *See Ornelas,* 517 U.S. at 695, 116 S.Ct. at 1661, 134 L.Ed.2d at 918. This Court has made clear that, under the Fourth Amendment, the level of suspicion necessary to consti-

tute reasonable, articulable suspicion " 'is considerably less than proof of wrongdoing by a preponderance of the evidence' " and " 'obviously less demanding than that for probable cause.' " *Quince v. State*, 319 Md. 430, 433, 572 A.2d 1086, 1088 (1990), *quoting United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989). Moreover, "[w]hen evaluating the validity of a detention, we must examine 'the totality of the circumstances-the whole picture.' " *Graham*, 325 Md. at 408, 601 A.2d at 136, *quoting United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981).

To be sure, as former Chief Justice Burger explained in *Cortez*, 449 U.S. at 418, 101 S.Ct. at 698, 66 L.Ed.2d at 629, the totality of the circumstances test contains two parts which must both be in existence before a stop is permissible:

> "First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

> \* \* \* \*

> "The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio*, . . . said that, "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." "

(citations omitted). *See also Lemmon*, 318 Md. at 378, 568 A.2d at 55; *Graham*, 325 Md. at 408, 601 A.2d at 135–36.

The critical question to be addressed in the case *sub judice* is how to evaluate whether the police have reasonable articulable suspicion in a particular context. The starting point is *Anderson*, which was our seminal case following *Terry*. There, police officers investigating a robbery committed six days earlier by two black males, one tall and one short, stopped and frisked two black males without any preliminary inquiry, one of whom was three to five inches shorter than the other. When stopped, the two suspects were walking in the neighborhood allegedly frequented by one of the robbers and had looked back several times at an unmarked police car as it patrolled the area. Officers stopped the two men and a search uncovered an unregistered handgun. The defendant appealed the denial of his motion to suppress evidence, the introduction of which resulted in his conviction of a handgun violation. In our analysis of *Anderson*, we identified factors "deemed relevant to a determination of reasonable suspicion to stop," *i.e.,* "the character of the area where the stop occurs, the temporal or spatial proximity of the stop to a crime and the appearance or conduct of the suspect," *Id.* at 707 n. 5, 387 A.2d at 285 n. 5, and applied them in reversing the defendant's conviction:

"Here, there [were] no facts from which it could be reasonably inferred that Anderson was the person the police officers were seeking, and hence that he was armed and dangerous. To arrive at such an inference from the tenuous facts that a tall and a short black man are seen together leaving a group, six days after a robbery committed by a tall and a short black man, in a neighborhood one of the alleged robbers is said to frequent, even when coupled with the fact that they looked back several times toward an unmarked police car, is wholly unreasonable. Indeed, to say that such facts constitute 'reasonable suspicion' would be perilously close to entitling a policeman 'to seize and search every person whom he sees on the street.' [*Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917, 935 (1968) ]. The police behavior here presents the very paradigm of the "inchoate and unparticularized suspicion or

'hunch.' " " *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883 [, 20 L.Ed.2d at 909]."

*Id.* at 707, 387 A.2d at 285.

Although discussing factors that inform the reasonable suspicion determination only implicitly, *Alfred v. State,* 61 Md. App. 647, 487 A.2d 1228 (1985), is nevertheless instructive. There, the Court of Special Appeals held that there was no reasonable, articulable suspicion for the stop of two black males within a mile of an abandoned stolen car, which had been occupied by several black males and had been seen leaving the area of a residential burglary, prior to being abandoned. The intermediate appellate court reasoned:

"The only basis that Officer Penney had for making a Terry stop of the appellant and his companion, at the very inception of that stop, was that they were two black males within less than a mile of an automobile that had been abandoned by three or four black males approximately ten minutes before. As we analyze these proximities of time and space, it is clear that the relevant epicenter was the spot on Grand Pre Road where the Datsun was abandoned and not the apartment on Pear Tree Lane that had been burglarized. The presence of two black males within a circle of almost a mile in radius would have little significance if that circle were imposed upon a densely populated and essentially all black neighborhood; the same presence in rural Finland might have far greater significance. Obviously, the demographics of this centrifugal force field could have some bearing on the probabilities which are offered as the basis for a stop. The State, which bears the burden of justifying warrantless activity, offered no direct evidence on the demographics.

"The indirect demographic clues argue against the State's position. The two suspects—Hall and Jones—who were picked up near the abandoned Datsun made reference to the nearby home of the aunt or grandmother of Jones. Hall, moreover, took the police to the home of a Mr. Hill in the 3200 block of Pear Tree Court, where all of the young men had been visiting earlier that evening. Officer Penney,

before stopping the appellant and Alexander, had stopped in a 7–11 Store situated between the abandoned Datsun and the spot where the appellant was first observed. He described five or six young black males who were in the 7–11, whom he cleared of suspicion because the proprietor vouched for their presence there through most of the evening. Officer Penney also described several commercial establishments in the immediate area—a Dart Drug Store and a K–Mart.

"The whole point is that a large area of relatively well populated suburbia lay within the suspect perimeter; and within that perimeter, there was nothing unusual about the presence of a black male. Under the circumstances, we find that the initial stop was no more than an 'inchoate and unparticularized suspicion or hunch.' "

*Alfred v. State,* 61 Md.App. at 656–57, 487 A.2d at 1233, *quoting Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.

In *Derricott v. State,* 327 Md. 582, 611 A.2d 592 (1992), this Court addressed whether police had reasonable and articulable suspicion to search a defendant, based solely upon a local drug courier profile. In that case, a young black male wearing a blue sweat suit, gold chains, and other thick jewelry, was driving a sports car 89 miles per hour in an area zoned for 55 mile per hour. When the officer stopped the car for speeding, he noticed an electronic pager and papers with telephone numbers written on them. Notwithstanding that the defendant did not appear nervous, and even promptly complied with all orders, the officer decided that the defendant matched the local drug courier profile, which included: (1) young, black males wearing expensive jewelry; (2) driving expensive cars, usually sports cars; (3) carrying beepers; and (4) in possession of telephone numbers. *See id.* at 585, 611 A.2d at 594. Although having "observed nothing unusual about [the defendant's] conduct or demeanor," the officer ordered him to exit his vehicle in order to search it, and his person, for "weapons." *Id.* We were presented with the question whether the officer had reasonable and articulable suspicion, supported by articu-

lable facts, that the defendant was engaged in criminal activity, and was armed and dangerous.

In clarifying the issue, we said:

"[W]hile it is true that 'a trained law enforcement agent may be "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer," ' such as 'the characteristics of the person engaged in ... illegal practices,' ... the officer must still be able to articulate why the elements of the profile lead to a reasonable suspicion that the person detained is armed and dangerous."

*Id.* at 588–89, 611 A.2d at 596, *quoting United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497, 515 (1980). We then concluded that the officer did not have a reasonable, articulable suspicion that the defendant was trafficking in drugs and was armed and dangerous, pointing out that "[t]hose of his attributes which match the drug courier profile are sufficiently common that allowing a search and seizure, however brief, on this basis alone would subject too many innocent travelers to the invasion of privacy that such police action necessarily entails." *Id.* at 592, 611 A.2d at 597.

More recently, in *Cartnail v. State,* 359 Md. 272, 753 A.2d 519 (2000), this Court again was faced with the issue. On this occasion, we utilized factors synthesized by Professor LaFave, and indeed urged upon us in the case *sub judice* by the State, as "reasonable suspicion" factors that courts generally consider:

"(1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation."

*Id.* at 289, 753 A.2d at 528, *quoting* 4 Wayne R. LaFave, *Search and Seizure* § 9.4(g), at 195 (3d ed. 1996 & 2000 Supp.).[9] There, we held that an officer did not have reasonable, articulable suspicion to stop a gold Nissan, occupied by two black men, approximately one hour and fifteen minutes after the report of an armed robbery in a different section of the city where the report indicated that a gold or tan Mazda with unknown tags and occupied by three black men fled in "no known direction." We began our analysis in *Cartnail* by noting "the lack of corroboration between the description of the robbery suspects and the circumstances surrounding Petitioner at the time of the stop" and the inapplicability of two factors, "observed suspicious activity of the motorist and knowledge that the motorist has been involved in other criminal activity of similar ilk but in an unrelated case." *Id.* at 290, 753 A.2d at 529.

Turning to the remaining factors—the level of detail of the description of the suspects,[10] the size of the area where the suspects may have been found, the number of persons in the area at the time of the stop, and the direction of flight—we observed:

"In looking at the description of the suspects, undoubtedly physical characteristics, such as race, gender, ethnicity, hair color, facial features, age, body build, or apparel of a suspect permits winnowing of innocent travelers. *See* 4 Wayne R.

9. In *State v. Lemmon*, 318 Md. 365, 379, 568 A.2d 48, 55 (1990), this Court considered, in evaluating whether the police had reasonable suspicion, the information leading to police action, the environment, the police purpose, and the suspect's conduct.

10. We pointed out in *Cartnail v. State*, 359 Md. 272, 291 n. 6, 753 A.2d 519, 530 n. 6 (2000), that:

"While it is well settled that race and ethnicity are identifying factors to be considered, they never can justify, by themselves, a *Terry* stop. *See [U.S. v.] Brignoni Ponce*, 422 U.S. [873,] 885–86, 95 S.Ct. [2574,] 2582–83, 45 L.Ed.2d [607,] 619–20 [(1975)] (Mexican ancestry is not alone enough to satisfy the reasonably suspicious standard); *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir.1982) (race is insufficient basis for investigatory police stop); *United States v. Clay*, 640 F.2d 157, 159 (8th Cir.1981) (race cannot be sole factor as grounds for police suspicion)."

LaFave, Search and Seizure § 9.4(g), at 195–96 (3d ed.1996 and 2000 Supp.). In addition to personal appearance, La-Fave explains:

'Quite obviously, it is also of considerable help if it is known that the offender actually or likely left the crime scene in a vehicle. And if a vehicle is involved, it is extremely useful to know something about the appearance of the car, such as its color, condition, special equipment, vintage or manufacturer, to have even part of the license number, or to know the number of occupants. This type of information is often very helpful notwithstanding the existence of detailed information about the offender's personal appearance, for the latter may be of little use when the offender is traveling by car and surveilling police cannot determine without first making a forcible stop whether any particular potential suspect has those characteristics.

"4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 197–98 (3d ed.1996 and 2000 Supp.). In essence, the more detailed and unique the description of the suspects, the more likely the police will have authority under the Fourth Amendment to make a *Terry* stop because the potential persons on the road matching the description will be fewer. *See* 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 198 (3d ed.1996 and 2000 Supp.). In assessing both the quality and quantity of details in the description, 'the most important consideration is whether the description is sufficiently unique to permit a reasonable degree of selectivity from the group of all potential suspects.' 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 198 (3d ed.1996 and 2000 Supp.). Furthermore, in determining whether a particular description is sufficiently unique, the description cannot be considered in a vacuum. The ultimate question is whether the description affords a sufficient basis for 'selective investigative procedures' vis-a-vis a universe made up of all persons within fleeing distance of the crime in question, and thus the characteristics of that group must be taken into

account. 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 199 (3d ed.1996 and 2000 Supp.).

"That universe, according to LaFave, 'will be determined primarily by the size of the area within which the offender might now be found (as indicated primarily by the amount of time which has passed since the offense) and the number of people about in that area. . . .' *See* 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 198, n. 297 (3d ed.1996 and 2000 Supp.)."

*Id.* at 291–93, 753 A.2d at 530 (footnote omitted).

Focusing on the facts of the case, we noted that gender, race, number of suspects, color of the car, car manufacturer, time of the robbery, and location of the robbery, from which reasonable suspicion could arise, were available to the officer and acknowledged that " 'conduct that appears innocuous to the average layperson may in fact be suspicious when observed by a trained law enforcement official.' " *Id.* at 293, 753 A.2d at 531, *quoting Ferris,* 355 Md. at 391–92, 735 A.2d at 510 (citing and discussing *Derricott,* 327 Md. at 591, 611 A.2d at 597). After pointing out, however, that a police officer may not simply assert that apparently innocent conduct was suspicious to him or her, but, rather, must offer "the factual basis upon which he or she bases the conclusion," *id.,* we concluded:

"The only factors present that matched Petitioner's circumstances were gender, race, and arguably the color of the car. The other factors were too tenuously corroborated, or not corroborated at all, by Petitioner's circumstances. There is no indication whatsoever that the factors considered in their totality were any more suspicious than their individual components. *See Ferris,* 355 Md. at 392, 735 A.2d at 510. Certainly, 'this is not a case where facts observed by the police officer take on a special meaning when viewed through the eye of that officer.' *Derricott,* 327 Md. at 591, 611 A.2d at 597. Furthermore, 'although the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless

there are concrete reasons for such an interpretation.''
*United States v. Wood,* 106 F.3d 942, 948 (10th Cir.1997)
(citing *Karnes,* 62 F.3d at 496)."

*Id.* at 293–94, 753 A.2d at 531. We rejected the State's
argument that the similarity of the car the defendant was
driving and that for which the look out was issued provided
the necessary corroboration, while also finding the elapsed
time between the look out and the stop quite significant. *Id.*
at 294–95, 753 A.2d at 531–32.

To the same effect, see *People v. Brown,* 215 A.D.2d 333,
627 N.Y.S.2d 45 (1995). In that case, the New York Supreme
Court, Appellate Division, reversed the denial of a motion to
suppress under facts as follows:

"Within three minutes of the commission of a robbery on
95th Street, between Amsterdam and Columbus Avenues, in
Manhattan, and after receiving a radio report that the
robbery was committed by two male blacks, police officers
observed two black men, defendant and another, fewer than
three blocks from that location. Proceeding southbound on
Central Park West, the officers cut across the northbound
traffic, drove their car 'at a diagonal' and stopped in front of
the men. After the men were directed to stop, turn around
and put their hands against the wall, one of the officers
patted them down and removed a folding knife from defen-
dant and an imitation pistol from his companion.

"The information relied on by the officers, even when cou-
pled with the police officers' observations that the men
appeared to be nervous and were 'looking back over their
shoulder and ... were glancing around,' is an insufficient
predicate for the police action.... There was no description
of the perpetrators other than that they were black. Nor
does their presence approximately three blocks from the
incident or their apparent nervousness serve as a basis for a
reasonable suspicion that they had committed a crime.
Accordingly, the motion should have been granted."

Turning to the case *sub judice,* application of the LaFave
factors produces a clear result. The description of the robber

broadcast in the look out was sparse at best. All that Officer Hayden testified that he knew as a result of the look out was that the robber was a black man wearing a black top. Such a sparse description does not sufficiently narrow the class of persons who could legitimately be stopped. A "black top" could include an overcoat, a jacket, a tee shirt, a suit jacket, or even simply a hat. This description is far too generic. Moreover, there was no description of a car and, indeed, the victim never saw a car. Consequently, that the petitioner was driving a car could not generate reasonable articulable suspicion.

The petitioner was stopped and detained within a short distance from the crime, in fact, just around the corner; however, approximately thirty minutes had elapsed between the robbery and the detention. Thirty minutes is a considerable amount of time for a robber to only have proceeded around the corner. Indeed, as the petitioner suggests and, in fact, argues "[e]ven a robber proceeding at a snail's pace would have been long gone and [the petitioner] was in a hurry."

This case is the converse of the situation in *Cartnail.* There, as here, the robbers escaped in no known direction and a considerable time, indeed, almost three times as much as in the present case, elapsed between the robbery and the stop. Quoting LaFave, we made the point that there is a significant difference between spotting a suspect within minutes of a crime, as opposed to an hour later, because:

> " '[T]he time and spatial relation of the 'stop' to the crime' is an important consideration in determining the lawfulness of the stop. The elapsed time indicates the minimum distance it would be possible for the offender to have covered since the crime, and this in turn supplies the radius of the area in which he might be found."

LaFave, § 9.4(g), at 204. Noting that the size of the area, the "range of possible flight," that the robbers could have taken after approximately one hour and fifteen minutes following the robbery is relatively enormous at its circumference, particularly because of the area's proximity to two interstate highways and three other major roadways, we opined:

"Given the circumstances, the State has provided no valid, logical reason why the robbery suspects would remain in Frederick any more than they would have traveled outside of Frederick in the one hour and fifteen minutes after the robbery. We cannot say that, all other things regarding the suspects' description remaining unchanged, a reasonable police officer could have pulled over Petitioner in any one of those metropolitan cities or in another sister state [reachable by the interstates or major highways] under such a flimsy guise of 'reasonable suspicion.'"

*Cartnail,* 359 Md. at 295, 753 A.2d at 532.

The current petitioner was stopped at about 10 p.m. and, at that time, there apparently was no one other than the petitioner in the area. The stop occurred on a residential parking lot, however, and, therefore, it was not unusual for there to have been traffic, pedestrian and vehicular, in the area. Nor can we assume, and we certainly are not told, that the presence of a black man in that area was unusual.

Because the victim did not observe the robber's flight, the lookout contained no information as to the direction that he took. This factor, therefore, plays no part in our analysis.

The officer testified that he observed the petitioner to act suspiciously and that contributed to the decision to stop him. The actions to which the officer referred related to the petitioner's speeding as he drove into the parking lot and perhaps to what can be characterized as reckless operation of his car as he parked. The officer also referred to the fact that the petitioner immediately turned his engine off and got out of his car once parked. We return to what we said in *Ferris:* although a police officer may be able to explain the significance of observed facts by virtue of training and experience, he or she cannot just say innocent conduct is suspicious, he or she must provide a sufficient basis for that conclusion. *Id.* at 391–92, 735 A.2d at 510.

Speeding and parking hurriedly, even recklessly, certainly generates a reasonable articulable suspicion that the driver is violating the traffic laws; but, here, such conduct is better

characterized as inconsistent with the belief that the driver has committed a robbery thirty minutes earlier just around the corner. As Professor LaFave indicates, it makes a significant difference, for reasonable suspicion purposes, if a suspect is spotted within a few minutes of a crime or many minutes thereafter. In this instance, the petitioner was speeding into a residential parking lot, not away from, so far as the officer reasonably could have known, the scene of the crime. Moreover, it simply is not suspicious behavior for one who has reached his or her destination to shut the engine of their car off and get out of the vehicle. Indeed, it is not inconceivable that had the petitioner not done so, that too would have been deemed suspicious.

The reasonableness of the officer's suspicion was further dissipated by the fact that the petitioner parked, even if diagonally, near a marked police cruiser. To be sure, the testimony was that the cruiser's lights were off; however, there is no testimony that the cruiser was not otherwise visible or that the petitioner seemed startled by the police presence.

It is not disputed that the officer had no knowledge of the petitioner's involvement in other known or suspected crimes. Therefore, this factor does not affect the analysis.

█ As we see it, then, the basis for the suspicion in this case was, as the motions court initially said, the petitioner's race, the fact that he was black, and the fact that petitioner was wearing a black top. Race, as we have seen, *see Cartnail*, 359 Md. at 291 n. 6, 753 A.2d at 530 n. 6, is not alone sufficient to establish reasonable suspicion. Additionally, the clothing description, as we have discussed, was too general. Reasonable, articulable suspicion was lacking for the stop of the car. Therefore, the motion to suppress the fruits of the pat down search should have been granted.[11]

---

11. The State relies on a number of out of State cases to buttress its position even though it acknowledges that "[i]n this fact intensive area, it is difficult to compare cases." In each of those cases, race alone was

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.

not the only viable, therefore, dispositive factor. *See United States v. Hall*, 557 F.2d 1114 (5th Cir.1977) (holding that four matches: color and make of getaway vehicle, the light complexion of the suspect, and multi-colored shirt or jacket with blue pants—was sufficient to raise reasonable and articulable suspicion); *Lee v. Wainwright*, 488 F.2d 140 (5th Cir.1973) (finding that suspect matched two criteria: he was a black male driving a Ford in the neighborhood where the crime occurred); *State v. Cox*, 295 Ill.App.3d 666, 230 Ill.Dec. 354, 693 N.E.2d 483 (1998) (basing decision on two matches: the suspect was wearing a short-sleeved shirt in March, in chilly Illinois, similar to the robbery suspect); *Commonwealth v. Jackson*, 451 Pa.Super. 129, 678 A.2d 798 (1996) (determining that four factors: defendant fit meager description, defendant was both spatially and temporally proximate to the crime scene, nature of the crime was a serious felony, and the confrontation was late in the evening in an admittedly dangerous area—were enough to arouse reasonable and articulable suspicion); *State v. Kyles*, 221 Conn. 643, 607 A.2d 355 (1992) (opining that eight matches were adequate); *Wells v. Commonwealth*, 6 Va.App. 541, 371 S.E.2d 19 (1988) (basing decision on four factors: black, male suspect was observed by an officer careening out of the parking lot of a suspected robbery target); *Walker v. City of Mobile*, 508 So.2d 1209 (1987) (justifying officer's stop of suspect where officer received a second prowler call within the same area and observed the defendant standing on the sidewalk in front of somebody's house looking at that house); *State v. Hicks*, 68 N.Y.2d 234, 500 N.E.2d 861, 508 N.Y.S.2d 163 (1986) (determining that many of the defendant's own actions gave the police reason for prolonging an initial traffic stop); *State v. Aversa*, 197 Conn. 685, 501 A.2d 370 (1985) (holding ten matches sufficient); *Patterson v. State*, 270 Ind. 469, 386 N.E.2d 936 (1979) (justifying stop where the suspects fit several points of a description); *State v. Buie*, 297 N.C. 159, 254 S.E.2d 26 (1979) (upholding a stop where the defendant roughly matched the description and could not produce identification and appeared nervous).