829 A.2d 992

**Michael Darnell COLLINS**

v.

**STATE of Maryland.**

**No. 70, Sept. Term, 2002.**

Court of Appeals of Maryland.

Aug. 4, 2003.

360

Julia Doyle Bernhardt, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

Following a trial in the Circuit Court for Talbot County, which he chose not to attend, petitioner, Michael Collins, was convicted of possession with intent to distribute cocaine and hindering a police officer in the performance of his duties. With two prior felony convictions under the Controlled Dangerous Substance laws, Collins was sentenced as a recidivist offender to 25 years without parole for the drug violation and was given a concurrent sentence of one day for the hindering. After that judgment was affirmed by the Court of Special Appeals, we granted *certiorari* to consider whether (1) there existed probable cause for petitioner's arrest and the search that was conducted pursuant to that arrest; (2) there was sufficient evidence to sustain the charge of hindering; and (3) petitioner was properly tried *in absentia*.[1] We shall affirm.

## BACKGROUND

Between 10:20 and 10:25 p.m. on January 19, 1999, the Easton Police department was alerted to an armed robbery of a High's convenience store. Sheriff's Deputy Scott Kakabar was the first to arrive on the scene. Upon exiting his patrol car, he looked around and, seeing no one, entered the store and conversed briefly with the clerk. Detective Shayne

---

1. We have restated the three questions raised in the petition for certiorari and in petitioner's brief. As framed by Collins, they assume facts or legal conclusions that are unsupported by the record and, for that reason, are misleading.

McKinney of the Easton Police Department then arrived and obtained a description from the clerk.

The clerk described the robber as an African–American male, approximately 5 feet 8 inches tall, weighing about 160 pounds, and wearing a black "nubbie" hat and a long-sleeved gray shirt or sweatshirt with a black stripe or stripes.[2] The clerk reported that the robber said that he was armed, and that he had "just left" on foot. Detective McKinney promptly broadcast that description to other members of the Easton Police Department.

Officer John Jones heard about the broadcast and drove to the area near the store. About eight to twelve minutes after the broadcast, he saw Collins in the parking lot of a Burger King store located across the six-to-eight lane U.S. Route 50 and about 200 yards from the High's store, walking away from the direction of the High's store. Collins, who was somewhat larger than the person described in the broadcast—six feet tall and 180 pounds—was wearing a black coat, a gray sweatshirt, and a black nubbie. Jones said that, as he entered the Burger King parking lot, Collins saw his patrol car and "quickly walked to [a] payphone to get on the phone as if he was going to make a call." Jones added that, when he first saw Collins, he was not walking toward the phone.

Officer Jones drove to the payphone, exited his car, identified himself, and conducted a field interview, in the course of which he obtained Collins's name, address, and date of birth. While obtaining this information, Jones learned from a radio dispatch that the robber fled the store with $200. Jones asked Collins how much money he had, to which Collins responded by pulling out a twenty dollar bill and stating that was all he had. Jones informed Collins that he matched the description of a robbery suspect who was reportedly in possession of two hundred dollars, and he asked if Collins had more than twenty dollars, to which Collins replied in the negative.

2. A "nubbie" hat was described as a knitted hat worn in cold weather and was compared to a watch hat that merchant sailors wear.

Jones then asked Collins if he could check, whereupon Collins "fled." Although Jones intended to hold Collins until the clerk could be brought to the scene to determine whether Collins was, in fact, the robber, he never advised Collins of that intent. Nor, to that point, had he used any force or show of force, as Collins had been entirely cooperative.

When Collins ran, Officer Jones, joined by two other officers who had just arrived at the parking lot, pursued, shouting for Collins to stop. After what he described as a "pretty lengthy foot chase," Jones was able to grab Collins and force him to the ground. Collins continued to resist, however, refusing to bring his hands out from under his waist. Aware that the robber was reportedly armed, Jones and the other officers struggled to free Collins's hands, finally using pepper spray. Not until other officers arrived were they able to place handcuffs on Collins. One of those officers found a vial or bag of crack cocaine in Collins's possession.

There was no evidence that Collins was the robber, and he was never charged with that offense. He was, however, charged by criminal information with possession of cocaine, possession with intent to distribute that substance, and obstructing and hindering a police officer. Collins responded with a motion to suppress all objects or items seized from his person, all statements made by him, and all in-court and out-of-court identifications of him. The gravamen of the motion seemed to be that, at the time Collins fled, the police had no reasonable ground to detain him, and that he had a right to leave. The court denied the motion. It concluded that, based on the description of the robber, the initial stop was appropriate and that the suspicion was heightened into probable cause when Collins ran.

A jury trial was set for September 2, 1999. When it became evident that Collins, who was free on bond, was not present in the courtroom that day, defense counsel informed the court that her office's last contact with him was two days earlier, that he had failed to appear for an appointment the day before that contact, that Collins knew the trial date, and that he had

inquired about a continuance because his daughter was facing surgery. Counsel said that she told him that, unless he brought her a letter from the hospital, a continuance was not feasible and "that he had to be here."

In an effort to locate Collins, the court instructed officers and sheriff's deputies to search for him in the circuit court building, the district court building, and at his home. While that was being done, the court proceeded with jury selection. After the jury had been selected, sworn, and sent to the jury room, the court was informed that Collins was still not present. Counsel advised the court that a sheriff had gone to the last two known addresses of Mr. Collins and had spoken with his mother, who attempted to locate him, that counsel had confirmed with her office that Collins had not called, and that she had called the hospital and the last two places of his employment, all with no success. She said that she had no explanation for her client's failure to appear. When she informed the court that Collins had a daughter who was severely handicapped and was set to undergo surgery at Kennedy Krieger Institute sometime during the month, the court took a recess so that counsel could call that institution in an effort to locate her client. After the recess, counsel informed the court that the daughter was not at Kennedy Krieger. She added that her office had spoken with the mother of the child, who confirmed (1) that the child was in school that day, and (2) that Collins was aware of the trial date because they had discussed the case several days earlier. Counsel paged Collins with her office number, to no avail.

Notwithstanding all of this, counsel asked for a two-week continuance, which the court denied. The judge stated that, in addition to counsel's efforts, his office had called the local hospital and ascertained that Collins was not in the emergency room and had not been admitted as a patient. The judge noted that, when Collins appeared for a pretrial hearing on August 6, he was informed that trial would be on September 2. The court concluded that it had followed the directives of this Court in *Walker v. State*, 338 Md. 253, 658 A.2d 239 (1995) and found that Collins was aware of the trial date and had

voluntarily chosen to absent himself from the trial. It denied the motion for continuance, noting that it would not be proper to keep the jury together for two weeks in the hope that Collins might appear, especially as their service as jurors would likely end before then.

At counsel's request, the court informed the jury, prior to opening statements, that Collins had chosen not to appear for trial. Counsel thanked the court and said "that the Court has bent over backwards to accommodate our efforts to locate him. The Court has bent over backwards, metaphorically, to accommodate all of our requests from this side of the trial table as well as *sua sponte* efforts to locate Mr. Collins to proceed today." When Collins appeared for sentencing—nearly two years later—he offered no explanation for his absence from trial. In pleading for a sentence permitting parole, he said that he had a daughter who was totally dependent on him and a father who was afflicted with cancer, but he did not indicate that either of those circumstances caused or necessitated his absence from trial.

## DISCUSSION

### *Validity of the Arrest*

Collins urges that the cocaine seized from his person was inadmissible in evidence because it was taken in violation of the Fourth Amendment. That is so, he says, because his arrest was unlawful. The arrest was unlawful, in his view, because it was effected without probable cause. In presenting this argument, Collins maintains that (1) Officer Jones had no reasonable articulable suspicion that he was the robber, and therefore no basis upon which to stop and detain him; (2) in order to avoid the prospect of an unlawful search of his person by Officer Jones, he was entitled to flee and, because his flight was justified, it cannot be considered in assessing probable cause; and (3) accordingly, there was no lawful basis for the arrest.

We agree that the issue must be examined in a sequential sense, beginning with the initial accosting of Collins by Officer

Jones. The Supreme Court first dealt, directly, with encounters of this kind in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which, among other things, the Court concluded that the governmental interest in crime prevention and detection justified the recognition "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906–07.

*Terry* and its immediate progeny involved investigatory stops where the police suspected the person of either being about to commit a crime, as in *Terry*, or in the course of committing a crime, which explains the Court's stressing of prevention and detection as the important governmental interest. In *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Court first considered the application of *Terry* to the accosting of an individual believed to have been involved in a completed crime. The balance of factors in that situation was somewhat different, in that a stop to investigate a completed crime does not promote the interest of crime prevention and detection and may not present the same kind of exigent circumstances as an effort to avert an imminent or ongoing crime. Nonetheless, the Court made clear that the police "are not automatically shorn of authority to stop a suspect in the absence of probable cause merely because the criminal has completed his crime and escaped from the scene." *Id.* at 228, 105 S.Ct. at 680, 83 L.Ed.2d at 611. Rather, the ability of the police, even in the absence of probable cause, to stop a person suspected of involvement in a past crime, ask questions, or check identification strengthens the strong governmental interest in solving crimes and bringing offenders to justice. Thus, the Court concluded:

> "Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large. Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest

that the crime be solved and the suspect detained as promptly as possible. The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes."

*Id.* at 229, 105 S.Ct. at 680, 83 L.Ed.2d at 612.

Although declining to determine whether *Terry* stops are permissible to investigate *all* past crimes, the Court held that it was enough to say that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Id.*

A *Terry* stop allows police to " 'investigate the circumstances that provoke suspicion.' " *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 617 (1975). They do this by asking the "detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334 (1984). *See also Nathan v. State,* 370 Md. 648, 660, 805 A.2d 1086, 1093 (2002) ("Reasonable suspicion of criminal activity warrants a temporary seizure for questioning limited to the purpose of the stop"). The detainee is not obligated to respond, however, and, "unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Berkemer,* 468 U.S. at 439–40, 104 S.Ct. at 3150, 82 L.Ed.2d at 334.

In determining whether an officer was justified in conducting a *Terry* stop, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740, 749 (2002) (citing *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)). *See also United States v.*

*Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989); *Graham v. State,* 325 Md. 398, 408, 601 A.2d 131, 136 (1992). In *Stokes v. State,* 362 Md. 407, 765 A.2d 612 (2001), this Court said that "there is no litmus test to define the 'reasonable suspicion' standard ..., it has been defined as nothing more than 'a particularized and objective basis for suspecting the particular person stopped of criminal activity,' ... and as a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." 362 Md. at 415, 765 A.2d at 616 (citations omitted).

Also in *Stokes,* 362 Md. at 420–21, 765 A.2d at 619, as we had earlier in *Cartnail v. State,* 359 Md. 272, 289, 753 A.2d 519, 528 (2000), we examined the six factors set forth by Professor LaFave as appropriate considerations in determining what constitutes reasonable suspicion:

> "(1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation."

4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.4(g), at 195 (3d ed. 1996 & 2003 Supp.).

█ Citing *Stokes, Cartnail,* and the LaFave factors, Collins stresses the disparity between his actual height and weight and that reported by the clerk, as well as the fact that the clerk reported the robber wearing a gray shirt with black striping, whereas he was wearing a gray sweatshirt under a black coat, without any striping, and he argues that Officer Jones did not possess a reasonable articulable suspicion that the petitioner was the robber, but was merely acting on an "inchoate hunch."

That argument focuses only on the first of the several factors noted by LaFave, and is, in any event, much too myopic. Both Professor LaFave and the courts have recognized that descriptions by victims may be imprecise as to height and weight and that robbers often shed or change their clothes to foil detection. LaFave posits that "investigating officers must be allowed to take account of the possibility that some of the descriptive factors supplied by victims or witnesses may be in error" and that "[w]hat must be taken into account is the strength of those points of comparison which do match up and whether the nature of the descriptive factors which do not match is such that an error as to them is not improbable." 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.4(g) at 201–02 (3d ed.1996).

In light not only of the other points of agreement with respect to this first factor but of the other factors as well, the disparities urged by Collins are inconsequential. Collins was seen shortly after the robbery in the vicinity of and walking away from the store. There did not appear to be anyone else around, at least no one close to matching the description of the robber. The clerk said that the robber had left on foot. Collins acted peculiarly when he spotted the police car, suddenly changing direction and heading for a telephone booth. Officer Jones could well infer, as he apparently did, that the sudden change in direction was intended to create a plausible reason for Collins being on the deserted lot late on a winter night—to use the telephone. He was an African–American male wearing a "nubbie" and gray and black clothing. It was a January night, and, with winter clothing, a disparity in an estimate of weight would not be unusual.

*Stokes* and *Cartnail* are both distinguishable. In *Stokes,* the officer, around 9:30 p.m., heard a report of a robbery that had just occurred. The lookout contained no description of height, weight, method of escape, or any get-away vehicle, but simply described a black male wearing a dark top. About 30 minutes later, the officer saw a black man, wearing a black leather jacket, drive into a parking lot just around the corner from the scene of the robbery at a high rate of speed, park

diagonally across lined parking spaces, and get out of his car. The officer stopped the man, patted him down, and felt a bulge, which turned out to be a controlled substance. Holding the frisk to be unlawful, we noted not only the very general description of the robber but the improbability of the robber (especially with a car) remaining in the immediate vicinity 30 minutes after the robbery.

*Cartnail*, too, was a much different case. The police there were told to be on the lookout for three black male robbery suspects, who had fled in an unknown direction in a gold or tan Mazda. About an hour and fifteen minutes after police received this information, and in close proximity to the robbery site, a patrol officer stopped Cartnail, a black male who was driving a gold Nissan and was accompanied by one black male passenger. Cartnail was arrested and charged for driving on a suspended license.

We held that the arresting officer did not possess the reasonable articulable suspicion needed to stop Cartnail. *Id.* at 296, 753 A.2d at 532. In reaching that conclusion, we noted that the only factors in the police description that matched Cartnail were his gender, race, and "arguably the color of [his] car." *Id.* at 293, 753 A.2d at 531. Factors such as the car manufacturer and number of suspects, the Court said, "were too tenuously corroborated, or not corroborated at all, by [Cartnail's] circumstances." *Id.* Another factor considered by the Court was the area where Cartnail was stopped, because it was near two major highways and three other major roadways. In one hour and fifteen minutes, the Court said, "the suspects could have remained in the City of Frederick or just as easily fled in the intervening time to Frederick County or even other urban centers such as Hagerstown, Baltimore, Washington, D.C., Annapolis, or rural areas in Maryland, Virginia, West Virginia, or Pennsylvania." *Id.* at 295, 753 A.2d at 531–32.

Unlike the descriptions in *Stokes* and *Cartnail*, the description of the robber in the present case was much more specific, including height, weight, type of clothing, and method of

escape. Moreover, the range of flight for the robber was limited: Collins was spotted, on foot, within about fifteen minutes after the robbery, about 200 yards away, across one major highway. Unlike Cartnail, Collins behaved in a way that aroused the officer's suspicions. Officer Jones was entirely justified in stopping Collins and asking questions designed either to confirm or dispel his reasonable suspicion that Collins might be the person who had just robbed the High's store.

■ That brings us to the second component—Collins's flight. He fled when Officer Jones, in response to Collins's assertion that all he had was $20, asked "do you mind if I were to check?" There is nothing in the record to indicate that Officer Jones had touched Collins in any way, that he was preparing to touch Collins, or that he had actually commenced or had begun to commence a search. His weapon was holstered; the conversation to that point had been civil and unremarkable; there had been no threats, and, although at some point Jones had been joined on the parking lot by two other officers, no other show of force. Jones asked a question, to which Collins could have responded in the negative. What Jones would have done had Collins simply said "no," is not even a matter of conjecture. At the suppression hearing, Jones was asked by defense counsel whether he intended to put his hands on Collins, and Jones responded "[n]ot without his consent. I asked him." No evidence to the contrary was ever produced, and the court obviously credited Jones's response. Collins nonetheless treats the question as a "demand that he submit to a search of his person"—a demand that he regards as unconstitutional and that he had a right to refuse by bolting.

■ Collins completely mischaracterizes the situation at that point. Although he had a right to refuse Jones's request, Jones was fully justified under *Terry* in making the request. A person temporarily detained in a *Terry* stop may validly consent to a search of his person, papers, or effects, *see Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75

L.Ed.2d 229, 238–39 (1983) and *cf. Miles v. State*, 365 Md. 488, 530, 781 A.2d 787, 811 (2001) ("a person in custody may still give valid consent to a search"), and that presupposes that it is permissible for an officer to seek such consent. Indeed, in *Berkemer v. McCarty, supra*, 468 U.S. at 439, 104 S.Ct. at 3150, 82 L.Ed.2d at 334, the Supreme Court expressly noted that one of the purposes of a *Terry* stop is to "try to obtain information confirming or dispelling the officer's suspicions." The suggestion by Collins either that the request to search was inappropriate or that Officer Jones was about to conduct a search without consent is wholly unsupported by the record.

Collins's argument that his flight is without legal significance in determining probable cause is founded on his fallacious assumption that the flight was necessary to avoid an imminent unlawful search of his person. He cites a number of cases holding that flight alone from police presence or flight from unlawful police activity does not create probable cause to effect a warrantless arrest. The proposition is correct but, in this case, irrelevant. More to the point are the cases establishing that flight from a lawful *Terry* encounter may sufficiently enhance an officer's existing suspicion to warrant an arrest. *See United States v. Holloway*, 962 F.2d 451, 461 (5th Cir.1992) (defendant's attempted escape from officers was sufficient additional factor to turn officers' reasonable suspicion into probable cause supporting arrest); *see also United States v. Martinez–Gonzalez*, 686 F.2d 93, 99–100 (2d Cir. 1982); *United States v. Dotson*, 49 F.3d 227, 231 (6th Cir. 1995); *Tom v. Voida*, 963 F.2d 952, 960 (7th Cir.1992); *Kelly v. Bender*, 23 F.3d 1328 (8th Cir.1994); *United States v. Bell*, 892 F.2d 959, 967 (10th Cir.1989); *People v. Griego*, 983 P.2d 99, 101 (Colo.Ct.App.1998); *State v. Deshon*, 194 Ga.App. 425, 390 S.E.2d 651, 652 (1990); *State v. Bumpus*, 459 N.W.2d 619, 624 (Iowa 1990); *State v. Hathaway*, 411 So.2d 1074 (La.1982); *Commonwealth v. Frank*, 407 Pa.Super. 500, 595 A.2d 1258, 1262 (1991).[3] In *Sibron v. New York*, 392 U.S. 40, 66–67, 88

---

3. Even Justice Brennan, no fan of an expanded reach of *Terry*, recognized that flight from a proper *Terry* stop may suffice to convert

S.Ct. 1889, 1904, 20 L.Ed.2d 917, 937 (1968), a companion case to *Terry*, the Court noted generally that "deliberately furtive actions and flight at the approach of strangers or law enforcement officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating to the evidence of crime, they are proper factors to be considered in the decision to make an arrest." *See also Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570, 576 (2000) ("headlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such").

We have no difficulty, on this record, in concluding that Collins's flight when asked whether Officer Jones could make a consensual search to determine whether Collins had more than the $20 he claimed, coupled with the other information Jones then possessed, sufficed to give the police probable cause to believe that Collins was the robber and thus to effect an arrest. The motion to suppress was properly denied.

### *Hindering*

Collins raises a narrow and somewhat skewed issue regarding his conviction for hindering. In his brief, he presents the question as "whether one against whom reasonable, articulable suspicion or probable cause is lacking, and who exercises his Fourth Amendment right to go about his business can, nonetheless, be guilty of obstructing a police officer in the performance of his duties."

---

reasonable suspicion into probable cause. *See United States v. Sharpe*, 470 U.S. 675, 705, 105 S.Ct. 1568, 1585, 84 L.Ed.2d 605, 628 (1985) (Brennan, J. dissenting) ("I had thought it rather well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest"); *Kolender v. Lawson*, 461 U.S. 352, 366 n. 4, 103 S.Ct. 1855, 1863 n. 4, 75 L.Ed.2d 903, 915 n. 4 (1983) (Brennan, J. concurring) ("some reactions by individuals to a properly limited *Terry* encounter, ... such as flight, may often provide the necessary information, in addition to that which the officers already possess, to constitute probable cause").

As presented in the brief, the issue hinges on the assumption that the detention from which he fled was unlawful. The answer to the question, as so presented, is that, because articulable suspicion and probable cause were *not* lacking in this case, the detention was not unlawful, and, as that is the only complaint Collins has made, he is entitled to no relief. There does lurk a much more substantial question never addressed by this Court, of whether conduct that consists either of mere flight from a *lawful* accosting, *Terry*-type detention, or attempt to arrest, or that otherwise would be encompassed by the separate crime of resisting arrest, falls within the ambit of the common law offense of hindering or obstructing a public officer in the performance of the officer's official duties. Because that issue, which would entail an exhaustive examination of the nature and scope of the common law offenses of hindering and resisting arrest, was not raised by Collins in his brief, and has, accordingly, not been addressed by the State, we shall defer consideration of it until a proper case in which it is clearly presented.

### Trial In Absentia

Collins argues that his trial *in absentia* was improper because the trial court failed to exercise any discretion in deciding to proceed without him. We disagree.

We have dealt with this issue on a number of occasions, most recently in *Pinkney v. State,* 350 Md. 201, 711 A.2d 205 (1998). We pointed out in *Pinkney* that a defendant is entitled, as a Constitutional right, under Maryland common law, and under Maryland Rule 4–231, to be present at trial. *Id.* At 208–09, 711 A.2d at 209. That right may be waived, however, and, under Rule 4–231(c), it *is* waived by a defendant who is voluntarily absent after the proceeding has commenced or who, personally or through counsel, agrees to or acquiesces in being absent. We are concerned here with whether Collins, personally or through counsel, agreed to or acquiesced in being absent.

After examining a number of earlier cases, we concluded in *Pinkney* that, when faced with a non-appearance of the defendant, the court, in determining whether to proceed with trial, "must balance two competing interests: the right of the defendant to be present at trial, and the need for the orderly administration of the criminal justice system." *Pinkney,* 350 Md. at 213, 711 A.2d at 211. In that regard, we added that "[b]efore trying a defendant *in absentia,* the trial court must both (i) find a knowing and voluntary waiver of the right to be present at trial and (ii) exercise sound discretion in determining whether to proceed with the trial of an absent criminal defendant." *Id.*

Voluntary absence, we said, must be established and not presumed merely from the defendant's non-appearance. To find that a defendant's absence is voluntary, the court must be satisfied as to two primary facts: "that the defendant was aware of the time and place of trial, and that the non-appearance was both knowing and sufficiently deliberate to constitute an agreement or acquiescence to the trial court proceeding in his or her absence." *Id.* at 215–16, 711 A.2d at 212. Collins does not suggest that he was unaware of the time and place of trial, and, indeed, the evidence is clear and uncontradicted that he was fully aware. Nor does he contest that his absence was voluntary, which the evidence also demonstrates beyond cavil.

We observed in *Pinkney* that this is usually the more difficult question, which requires some investigation by the court. If, through such an investigation, the court determines that the defendant could have appeared but made a conscious decision not to do so, it may find a waiver from that affirmative information. More frequently, however, as here, there will be no affirmative confirmation of a deliberate decision not to appear but rather "information suggesting the non-existence of alternative explanations." *Id.* at 216, 711 A.2d at 213. In that situation, "[i]f reasonable inquiry does not suggest that the defendant's absence was involuntary, and if the information before the court implicitly suggests no other reasonable

likelihood of involuntary absence, the court may, as in *Walker* [*v. State*, 338 Md. 253, 658 A.2d 239, *cert. denied*, 516 U.S. 898, 116 S.Ct. 254, 133 L.Ed.2d 179 (1995)], draw the *initial* inference that the defendant's absence was a knowing one and was sufficiently deliberate so as to constitute an acquiescence to being tried *in absentia.*" *Id.* at 216–17, 711 A.2d at 213. We declined to enunciate any particular litany that the court must follow but simply required that the record reflect "that adequate inquiry has been made to ensure that a defendant's absence is not in fact involuntary." *Id.* at 217, 711 A.2d 205.

As noted, Collins does not contend that the trial court failed to make an adequate inquiry or that the inquiry it made before commencing the trial did not essentially rule out any reasonable inference that his non-appearance was other than voluntary. Indeed, we cannot imagine what more the court could have done to investigate the cause of the non-appearance or how it reasonably could have reached any other conclusion than that the non-appearance was voluntary. We made clear in *Pinkney* that a determination of voluntariness based on the court's immediate investigation is merely an initial one and that the court has an obligation at a subsequent court proceeding to allow the defendant to explain the circumstances of his or her absence. That was done in this case, and Collins candidly admitted that he had no explanation.

The only complaint that Collins makes is that the court, having found his absence to be voluntary, failed to exercise the discretion it had, nonetheless, to postpone the trial and not to proceed in his absence. *Pinkney* addresses that as well. We said there that a finding of waiver does not end the inquiry— that a trial *in absentia* "should not follow, *ipso facto*, every time the trial court finds that the defendant waived the right to be present at trial." *Id.* at 218, 711 A.2d at 214. Rather, "the court has discretion not to proceed . . . until the court has more information as to the defendant's whereabouts and circumstances." *Id.* That discretion, we said, "should be exercised after a review of all the appropriate concerns and with the recognition that the public interest and confidence in

judicial proceedings is best served by the presence of the defendant at trial." *Id.* Although we noted a number of factors that other courts had considered in determining whether to proceed, we declined to mandate any particular list, concluding only that, on the ·one hand, "[c]ircumstances exist when an accused's voluntary absence and defiance of the court is itself sufficient to justify a trial in the defendant's absence," but, on the other, that "*routinely* conducting a trial in the absence of the accused, particularly when the trial has not yet commenced, is not condoned." *Id.* at 221, 711 A.2d at 215 (emphasis added).

The trial court *did* exercise discretion; it did not *routinely* proceed in Collins's absence. It is telling that defense counsel had initially agreed to proceed, and that, as a result, a jury had been selected. Counsel commended the court, not just for "bending over backward" to accommodate her requests but as well for its heroic efforts to determine Collins's whereabouts. The court had no idea when Collins would become available and expressed concern that the jury's term might expire before he could be located and brought to trial. As noted, trial occurred on September 2, 1999; Collins did not appear again until June 24, 2001—nearly two years later. We find no abuse of discretion, and no error, in the court's proceeding with trial.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

Dissenting opinion by BATTAGLIA, Judge, in which BELL, Chief Judge and ELDRIDGE, Judge, concur.

I respectfully dissent. I disagree with the majority's approval of the trial court's decision to try Collins *in absentia.* The majority's decision runs afoul of this Court's guidance in *Pinkney* and establishes a dangerous precedent for the future use of trials *in absentia.*

Although this case is not one of them, I do agree that some situations warrant trial *in absentia.* In *Walker v. State,* 338 Md. 253, 658 A.2d 239 (1995), this Court held that trial *in*

*absentia* was appropriate. Three defendants in that case faced charges of stealing over two million dollars from lenders and investors "in a complicated web of phony real estate projects." *Id.* at 255, 658 A.2d at 240. They all appeared at a pre-trial proceeding where they were informed of the trial date; however, two of the defendants, Walker and Lee, failed to appear on the day of trial. *Id.* at 256, 658 A.2d at 240. The Court was persuaded that the judge made sufficient inquiries to determine that the defendants knowingly had waived their right to trial. The trial judge had learned from these inquiries that the defendants had not been heard from in over eight days and that most of their possessions had been removed from their residence. *Id.* at 255–56, 658 A.2d at 240. The judge also exercised proper discretion in proceeding with trial because there would be a great burden on the State in rescheduling "such a complex case" and recalling all forty to forty-five witnesses it had planned to call. *Id.* at 256, 658 A.2d at 240.

Three years later, *Pinkney v. State,* 350 Md. 201, 711 A.2d 205 (1998), however, made it clear that the situations warranting trial *in absentia* are few. Judge Raker, for the Court, stated emphatically, "Trial *in absentia* is not favored." *Id.* at 218, 711 A.2d at 214. Rather, it "should be the extraordinary case, 'undertaken only after the exercise of a careful discretion by the trial court.'" *Id.* at 221, 711 A.2d at 215 (quoting *In re Dunkerley,* 135 Vt. 260, 266, 376 A.2d 43, 48 (Vt.1977)). As such, a trial *in absentia* is allowed only when the trial court (1) "find[s] a knowing and voluntary waiver of the right to be present at trial" and (2) "exercise[s] sound discretion in determining whether to proceed with the trial of an absent criminal defendant." *Id.* at 213, 711 A.2d at 211.

These criteria were established in recognition of a criminal defendant's common law and constitutional right to be present at his or her trial, as explained in *Pinkney:*

As the United States Supreme Court observed, the right of a criminal defendant to be present at every stage of trial is "scarcely less important to the accused than the right of trial itself." The right to be present at trial is a common

law right guaranteed by Article 5 of the Maryland Declaration of Rights, and is also "to some extent protected by the Fourteenth Amendment to the United States Constitution, and is guaranteed by Maryland Rule [4–231]."

* * *

The constitutional right of a defendant to be present at trial is rooted largely in the right to confront witnesses and is also protected in some situations by the Due Process Clause where the right of confrontation is not implicated. The right to be present at trial implicates a panoply of rights and vindicates two primary interests: enabling the defendant to assist in the presentation of a defense, and ensuring the appearance of fairness in the execution of justice.

*Id.* at 208–09, 711 A.2d at 209 (citations omitted).

The *Pinkney* Court also identified numerous countervailing interests that other courts have found relevant in determining what situations do not warrant a trial *in absentia.* Included among these are the likelihood that the defendant will soon be available for trial, the difficulty in rescheduling, and the "State's legitimate interest in 'keeping the trial calendar moving.'" *Pinkney,* 350 Md. at 220, 711 A.2d at 215. Courts also were to take into consideration the number of witnesses and their availability for a later trial date, the State's difficulty in reassembling its proof in the case, potential inconvenience to jurors, and the difficulties presented in a case involving more than one defendant. *Id.* at 219–20, 711 A.2d at 214–15.

These principles guided the *Pinkney* Court to determine that the trial judge improperly had tried Pinkney *in absentia.* Prior to the day of his trial, the defendant had been granted several continuances because he repeatedly had appeared before the court without counsel. *Id.* at 206–07, 711 A.2d at 208. On the morning of the trial date, the defendant failed to appear, and, again, was not represented by counsel. *Id.* at 207, 711 A.2d at 208. Concerned that his witness would not be available on another day, the prosecutor suggested a trial *in absentia* because he believed he could "wrap it up in like 30 to

45 minutes." *Id.* The judge agreed, holding the defendant's trial later that afternoon. Without defense counsel present, the prosecutor empaneled the jury and presented its case in seventy minutes, after which the defendant was convicted. Later, at his sentencing proceeding, the defendant explained to the judge that he had been absent because, on the day of his trial, he had suffered a seizure and refused to go to the hospital. The explanation, however, fell on deaf ears, as evidenced by the trial judge's statement: "Well, I'm sorry. He could have come late. He could have come the next day. He could have done something." *Id.* at 208, 711 A.2d at 209.

This Court reversed the conviction, holding that the trial judge incorrectly found that the defendant voluntarily had waived his right to be present. *Id.* at 222–25, 711 A.2d at 216–17. Although the trial judge determined that the defendant was aware of his trial date and that he was not incarcerated, no efforts had been made to contact the defendant on the day of trial, nor had the trial judge checked with local hospitals to determine if the defendant had been admitted (even though the defendant had acknowledged that he had not been hospitalized). *Id.* at 222–23, 711 A.2d at 216. The Court also expressed particular concern that he proceeded with the trial even though the defendant was unrepresented by counsel. *Id.* at 223–24, 711 A.2d at 216. Additionally, the trial judge had not considered the defendant's explanation of his absence adequately. *Id.* at 224, 711 A.2d at 216–17.

The guidance from *Pinkney* requires a trial judge to (1) determine that a defendant knowingly and voluntarily waived his right to appear, and (2) exercise sound discretion by exploring and balancing various considerations even in the face of a defendant's voluntary absence from trial.

Collins voluntarily did not appear for trial. The inquiry does not end, though, with this determination. Rather, according to *Pinkney*, the decision to try a defendant *in absentia* "should not follow, *ipso facto*, every time the trial court finds that the defendant waived the right to be present at trial." 350 Md. at 218, 711 A.2d at 214. The decision to

invoke a trial *in absentia* "should be exercised after a review of all the appropriate concerns and with the recognition that the public interest and confidence in judicial proceedings is best served by the presence of the defendant at trial." *Id.*

Nevertheless, most of the numerous governmental interests that compete with Collins's right to be present at trial do not play a role in this case. Collins was the sole defendant in a relatively routine narcotics case, unlike *Walker*, which involved multiple defendants who were to be tried for a complex theft conspiracy. The State's witnesses in the present matter, which numbered only five, all worked for local police agencies and likely would have been available for a later trial date. In *Walker*, however, the State expected forty to forty-five witnesses to be called. I do not see what circumstances in this case the majority considers so "extraordinary" as to justify a trial *in absentia*. Quite simply, it appears that trial *in absentia* now has become the "punishment" for failure to appear rather than the issuance of a bench warrant and revocation of bond while awaiting trial.

Having held today that the trial judge exercised proper discretion in trying Collins in his absence despite quite ordinary circumstances, the majority has opened the door to what this Court cautioned against in *Pinkney*—"routinely conducting a trial in the absence of the accused, particularly when the trial has not yet commenced." *Pinkney*, 350 Md. at 221, 711 A.2d at 215. Under the majority's holding, once the trial court determines that the defendant voluntarily absented himself or herself, trial *in absentia* may follow as long as defense counsel is present and the judge has "no idea" when the defendant "would become available."[1] Maj. Op. at 378. Such a scenario presents itself "frequently," every time the court lacks "affirmative confirmation that the defendant's absence is voluntary" and then draws an "inference that the defendant's

---

1. The efforts made by the trial judge to locate Collins, however "heroic" they were, only help establish that his absence was voluntary. They should not be considered in determining whether the judge balanced the appropriate concerns after it has become clear that the defendant waived the right to be present.

absence was a knowing one and was sufficiently deliberate so as to constitute an acquiescence to being tried *in absentia.*" *Pinkney,* 350 Md. at 216–17, 711 A.2d at 213. In more simple terms, the majority holds that every time counsel is present and the defendant cannot be found, it is fine to hold the trial as scheduled.

This precedent does not duly "recogni[ze] that the public interest and confidence in judicial proceedings is best served by the presence of the defendant at trial." *Id.* at 218, 711 A.2d at 214. The *Pinkney* Court went to great lengths to emphasize that limiting the trial court's discretion to hold trials without the accused promotes "an accurate determination of guilt and ... public confidence in the judiciary as an instrument of justice." *Id.* at 219, 711 A.2d at 214. (citations omitted). Further, the Court stated that the defendant's presence at trial "assures that the trial court is 'keenly alive to a sense of [its] responsibility and to the importance of [its] functions.'" *Id.* (citations omitted). Now, the majority undercuts these substantial State interests by significantly broadening the practice of trying defendants *in absentia.* Such a departure from the principles that, in part, guided the Court's decision in *Pinkney* signifies the majority's assessment that management of the trial calendar is more important than preserving the long-term public confidence in judicial proceedings. I do not subscribe to this point of view.

Chief Judge BELL and Judge ELDRIDGE concur with this dissenting opinion.