978 A.2d 852

**In re LORENZO C.**

**No. 2593, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Aug. 27, 2009.

412

414

Allson M. Sayers (Nancy S. Forster, Public Defender), on the brief, Baltimore, for appellant.

Mary Ann Ince (Douglas F. Gansler, Attorney General, on the brief), Baltimore, for appellee.

DAVIS, WOODWARD, and RAYMOND G. THIEME, Jr. (Retired, Specially Assigned), JJ.

DAVIS, J.

Appellant, Lorenzo C., was charged as a juvenile with wearing and/or carrying a handgun and related charges. On November 5, 2007, the Circuit Court for Prince George's County (Dawson, J.) held an adjudicatory hearing on the charges. At this hearing, Lorenzo C. moved to suppress the handgun; however, this motion was subsequently denied. At the conclusion of the hearing, the court found Lorenzo involved in the crime of possession of a handgun. On November 29, 2007, the court held a disposition hearing and ultimately ordered Lorenzo to be placed on an indefinite period of supervised probation at the Maryland Department of Juvenile Justice. Appellant filed this timely appeal and presents the following question for our review:

Did the trial court err in denying appellant's motion to suppress?

For the reasons that follow, we answer appellant's question in the negative. Accordingly, we affirm the judgment of the circuit court.

## STATEMENT OF FACTS

At the hearing on appellant's Motion to Suppress, Officer Argens Contrares of the District of Columbia Police Department testified that, at approximately 1:00 a.m. on December 19, 2006, he was in the 5700 block of Eastern Avenue in the District of Columbia, responding to a call for a robbery that had occurred in the 6100 block of Eastern Avenue, Northeast, approximately four blocks from his position. According to Officer Contrares, he and his partner were canvassing the area in response to a police radio broadcast that the robbery had been committed by "several suspects, one of whom was on

a bicycle, wearing dark clothing." When asked what he observed at the 5700 block of Eastern Avenue, Officer Contrares testified that he and his partner saw "a group of subjects, about four of them, including a gentleman on a bike at the corner, standing at the corner of the 5700 block." The corner where the group was standing was located "at the border between D.C. and P.G. (Prince George's) County," four blocks away from the scene of the alleged robbery in the District of Columbia. Lorenzo C. was one of the individuals in the group.

Officer Contrares described what occurred as the officers approached the group on foot:

Well, as we entered further into Maryland, 'cause they were walking into Prince George's County, I stepped out of the vehicle to conduct, well I attempted to conduct a stop. The individual on the bike kept going which is why my partner kept trying to catch up to the individual as I stayed with the [appellant] and a couple more individuals at the scene.

When asked to describe appellant's behavior, Officer Contrares explained:

As I tried to interview the [appellant,] he had his hand in his pockets. I asked him, for officer safety, to let me see his hands. He didn't respond to me; he didn't want to take his hands out of his pocket, let me see his hands. Once again, he denied my request.

* * *

Well, when I was asking him, he was kind of hesitant, kind of walking away from me looking back at me. Also, making furtive gestures and movements inside his pockets. And that's when I decided that I need to make physical contact to get his hands out of his pocket, lay it against the vehicle, ask my partner to come back and assist me since I had three individuals with me and I was alone and conducted a pat-down, a protective pat-down.

After Officer Contrares forcibly removed appellant's hands from his pockets and placed him against his police vehicle, he

conducted a frisk of appellant, finding a revolver inside his right jacket pocket. The only testimony elicited on cross-examination that expounded upon that received on direct examination related to Officer Contrares' characterization of appellant's hand movements as "furtive":

I mean he appeared very nervous after I asked him the second time and he was also moving his hands inside his pockets. I could tell he was moving his hands because I was looking at his hands. At least I tried to, to make sure obviously 'cause there was one of me and three of them.

Officers from Prince George's County subsequently responded to the scene and recovered the gun. These officers assisted in appellant's arrest.

Appellant's trial counsel and counsel for the State presented their respective arguments on the motion to suppress: [1]

[APPELLANT'S COUNSEL]: Your Honor, again, the argument. Mr. C had a right to be free from unreasonable searches and seizures. First of all, an individual has the right to walk away from an officer. An officer can stop a person if that officer believes that there is reasonable suspicion that criminal activity is afoot.

If then there is a separate basis for a frisk, a person can be patted down. Neither of which existed here when Officer Contrares approached him and then subsequently patted him down.

In addition, Your Honor, in order for a Metropolitan Police Department officer to even have, from what I can read of the law, jurisdiction or a basis to arrest a person, they have to have felony, excuse me, probable cause that a felony has been committed and essentially be in hot pursuit crossing over the jurisdictional line.

---

1. Because of the perfunctory nature of the suppression court's ruling on the Motion to Suppress, we deem it helpful to reproduce the arguments of counsel in order that we may review the issues, as framed by counsel, before the suppression court.

And he was arrested, Your Honor, when he was placed up against that police car. No reasonable person would believe after an officer takes his hands out of your pockets and puts you against a police car, which is what Officer Contrares testified that he did, that you could walk away at that juncture. So, he was arrested and pursuant to Criminal Procedure Section 2–305, he did not have the authority to do that.

It was an illegal seizure and as a result of that the gun should be suppressed, Your Honor. There was not probable cause that he had committed any felony at that juncture. And the officer didn't have any basis to come in to Prince George's County. He could have conceivably followed him, called PG County and they could have taken their own actions but he chose not to do that. He overstepped his boundaries, Your Honor, and for that the gun should be suppressed.

THE COURT: What was with the call for the armed robbery?

[APPELLANT'S COUNSEL]: I'm sorry, what Your Honor?

THE COURT: What was the call for the armed robbery that Contrares testified about? What was that all about?

[APPELLANT'S COUNSEL]: They're, my understanding is based on that testimony, obviously I have some other reports and things which Your Honor doesn't have, is that there was an allegation that a robbery had occurred in the District of Columbia.

THE COURT: Yeah.

[APPELLANT'S COUNSEL]: And there was a lookout essentially for individuals wearing dark clothing and someone on a bike.

THE COURT: Right.

[APPELLANT'S COUNSEL]: That might give him—

THE COURT: Probable cause?

[APPELLANT'S COUNSEL]: No, not probable cause that he had committed a crime, Your Honor. Probable cause,—

THE COURT: Okay.

[APPELLANT'S COUNSEL]:—Your Honor, requires more than that and I apologize 'cause I printed the case and I don't have it right in front of me, Your Honor. But probable cause requires, Court's indulgence. Facts and circumstances within the arresting party's knowledge of which they have reasonably trustworthy information and are sufficient in themselves to authorize a man of reasonable caution in the belief that an offense has been committed by the person arrested.

He may have had some suspicion, Your Honor, that this person may have been involved in that but there was no particular description, no height, no weight, no age, no specific clothing in terms of types of dark garments show- it's counsel's position that there's no reasonable suspicion but I'll back up to that argument in a minute, Your Honor. In looking at probable cause, a lookout giving a vague description is not sufficient to warrant that an offense has been committed by this person.

THE COURT: Okay. Let me hear from the State. State?

[THE STATE]: Well, Your Honor, I think you have to look at the totality of the circumstances. A lookout was broadcast that there were a group of males, one was riding a bike. They were all dressed in dark clothing. A short time later, Officer Contrares and his partner came upon the [appellant] and a group of individuals. They were all dressed in dark clothing and one was on a bike.

This was the middle of the night, 12:30, 1:00 in the morning. They were four blocks from the location of the alleged robbery. At this point, the [appellant] and his friends or the people he [was] with were in Washington, D.C. At some point they crossed over to Prince George's County but at this point Officer Contrares, based on the

description given, based on all the circumstances, had a reasonable belief that this [appellant] and the other people he was with was involved and possible suspects to the robbery that had occurred.

At minimum, he has the right to do a *Terry* investigatory stop. Now, he goes over to the [appellant] and the [appellant] is acting all jittery, nervous. Hands are in and out of his pockets.

THE COURT: No, hands were in his pockets.

[THE STATE]: In and out of his pockets.

THE COURT: In his pockets.

[THE STATE]: In his pockets.

THE COURT: Fidgeting in his pockets, basically.

[THE STATE]: The officer said "please remove your hands from your pockets" twice. The [appellant] did not comply. Now, coupled with the fact that it's dark, it's three individuals, Officer Contrares's partner is trying to track down a person who was on the bike. He's investigating them for a robbery. For his own safety, at that point, he needs to check and see what's going on. He pats him down and there's a gun in his pocket.

The State's argument is one, Officer Contrares was in pursuit. There's nothing in the Annotated Code of Maryland that says it has to be a hot pursuit, that they're running down the street and their sirens are blazing. He sees the [appellant]; the [appellant] crosses the street. He has the right to go into Prince George's County and see what's going on.

I mean the opposite, I mean that wouldn't even make sense. Are we saying that people can't go or officers can't go into other jurisdictions when they have a reasonable belief that the person they're trying to stop has committed a crime, a felony.

At the conclusion of the hearing, the entirety of the court's ruling, in denying appellant's Motion to Suppress, was: "The Court has had an opportunity to review the law, to review the testimony and the Court would, in fact, believe that the officer

did have reasonable suspicion at the time of the stop and at the time of engaging the [appellant]. And the Court will deny the Motion to Suppress at this time." Appellant was subsequently found to be "involved" in wearing and/or carrying a handgun.

## STANDARD OF REVIEW

" 'In reviewing the denial of a motion to suppress under Maryland Rule 4–252, we look only to the record of the suppression hearing and do not consider the record of the trial' " (or proceeding adjudicating the merits, *i.e.*, agreed statement of facts). *Graham v. State*, 119 Md.App. 444, 449, 705 A.2d 82 (1998) (quoting *In re Tariq A–R–Y*, 347 Md. 484, 488, 701 A.2d 691 (1997); *see also Gamble v. State*, 318 Md. 120, 125, 567 A.2d 95 (1989); *Herod v. State*, 311 Md. 288, 290, 534 A.2d 362 (1987); *Jackson v. State*, 52 Md.App. 327, 332 n. 5, 449 A.2d 438 (1982); *Trusty v. State*, 308 Md. 658, 670, 521 A.2d 749 (1987)). In considering the evidence presented at the suppression hearing, "[w]e extend great deference to the fact finding of the suppression hearing judge with respect to determining the credibilit[y] ... of the witnesses and to weighing and determining first-level facts." *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356 (1990). "When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his or her findings are clearly erroneous." *Graham*, 119 Md.App. at 449–50, 705 A.2d 82 (citing *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990)). " 'When the question is whether a constitutional right, such as here, a defendant's right to be free from unreasonable searches and seizures, has been violated, the reviewing court makes its own independent constitutional appraisal, by reviewing the law and applying it to the particular facts of the particular case.' " *Stokes v. State*, 362 Md. 407, 414, 765 A.2d 612 (2001) (quoting *Jones v. State*, 343 Md. 448, 458, 682 A.2d 248 (1996)). *See also Lawson v. State*, 120 Md.App. 610, 614, 707 A.2d 947 (1998); *Graham*, 119 Md.App. at 450, 705 A.2d 82 (citing *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Perkins*, 83 Md.App. at 346, 574 A.2d 356)) (Holding

that, "[a]s to the ultimate conclusion, however, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case."). In determining whether a seizure of the person took place, we look to the totality of the circumstances of the initial encounter between appellant and the police. *Ferris v. State*, 355 Md. 356, 376, 735 A.2d 491 (1999). We review the trial court's factual findings in the light most favorable to the State and review these findings for clear error, but we review the legal conclusions *de novo*. *Id.* at 368, 735 A.2d 491 (citations omitted).

## LEGAL ANALYSIS

### A

### *Parties' Contentions and Circuit Court Ruling*

The parties do not dispute that Officer Contrares detained appellant to conduct a brief investigatory stop. Rather, the parties dispute whether the stop and subsequent search was based on reasonable articulable suspicion and therefore valid under the Fourth Amendment. Relying principally on the decisions of the Court of Appeals in *Stokes*, 362 Md. 407, 765 A.2d 612, *Jones v. State*, 319 Md. 279, 572 A.2d 169 (1990), and *Cartnail v. State*, 359 Md. 272, 753 A.2d 519 (2000), appellant contends that "Officer Contrares lacked reasonable articulable suspicion to stop [him]," but that, "[e]ven assuming *arguendo* that Contrares was justified in stopping [him], the officer did not have the requisite reasonable and articulable suspicion to frisk him." In support of his argument, he endeavors to apply the factors espoused by Professor LaFave in analyzing the existence, *vel non*, of reasonable articulable suspicion in his treatise [2] and adopted by the Court of Appeals in *Cartnail*, 359 Md. at 289, 753 A.2d 519 and *Stokes*, 362 Md. at 421–22, 765 A.2d 612. Appellant summarizes the gravamen of his Fourth Amendment challenge in his brief by concluding that

---

2. 4 Wayne R. LaFave, Search & Seizure, § 9.4(g) at 195 (3d ed. 1996 & 2000 Supp.).

the officer's suspicion must be reasonable, giving due weight "not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

Because the justification required for a stop differs from that required for a frisk, the right to stop a person does not automatically confer upon the police the right to conduct a pat-down search for weapons. In the present case, even if Officer Contrares was legally justified in stopping [appellant], he did not have the requisite reasonable and articulable suspicion to believe that he was armed.

(Citations omitted).

"Police officers may conduct a brief investigatory detention based on reasonable, articulable, suspicion that criminal activity is afoot," counters the State, citing the seminal decision in *Terry v. Ohio*, 392 U.S. 1, 21, 28, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and, in accordance with that well-settled principle, asseverates, "Officer Contrares' actions constituted a reasonable police investigation based upon the report of a crime and [constituted] wholly reasonable and prudent action undertaken for his protection in dealing with multiple subjects singlehandedly." The proper test, implores the State, is " 'the totality of the circumstances,' viewed through the eyes of a reasonable, prudent police officer." *Bost v. State*, 406 Md. 341, 356, 958 A.2d 356 (2008) (citing *Stokes*, 362 Md. at 415–16, 765 A.2d 612).

As noted, the court's only ruling on appellant's Motion to Suppress was that "the officer did have reasonable suspicion at the time of the stop and at the time of engaging the [appellant]." Although the court made no findings regarding the credibility of Officer Contrares, the evidence was essentially undisputed; hence, we review that evidence in the light most favorable to the State.

## B

### *Scope of Investigative Stop*

The Fourth Amendment of the United States Constitution, applicable to the States *via* the Fourteenth Amendment of the

United States Constitution, *Mapp v. Ohio,* 367 U.S. 643, 647, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

 Fourth Amendment protections extend to brief investigatory stops permitted in street confrontations between a citizen and the police investigating observed suspicious behavior. *Stokes,* 362 Md. at 414, 765 A.2d 612. A *Terry* stop allows police to " 'investigate the circumstances that provoke suspicion.' " *Collins v. State,* 376 Md. 359, 368, 829 A.2d 992 (2003) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). "The detainee is not obligated to respond, however, and, 'unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.' " *Id.* at 368, 829 A.2d 992 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). If an officer has an articulable basis for a reasonable belief that crime is being or is about to be committed, a police officer may make a brief stop of a suspect in order to investigate. Thus, investigatory stops are justified as a result of the need for " 'necessarily swift action predicated upon the on-the-spot observations of the officer.' " *Watkins v. State,* 288 Md. 597, 602, 420 A.2d 270 (1980) (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. 1868).

 "A police officer may direct an inquiry to a citizen, even when he or she has no cause for doing so and it may be entirely appropriate for that citizen to decline 'to stop or respond to such inquiries.' " *Stokes,* 362 Md. at 414, 765 A.2d 612 (quoting *Anderson v. State,* 282 Md. 701, 708, 387 A.2d 281 (1978)). "Under the Fourth Amendment, an officer may make a forcible stop of a citizen ... if the officer has reasonable grounds for doing so." *Id.* at 414–15, 765 A.2d 612. This investigatory stop constitutes a seizure of the person, but not

an unreasonable seizure violating a person's Fourth Amendment protections.

 Under the Fourth Amendment, police officers conducting investigatory stops need not have probable cause; rather, to justify such an intrusion, the officers must have "reasonable articulable suspicion." *Id.* at 415, 765 A.2d 612. "Reasonable articulable suspicion" has been defined as "a particularized and objective basis for suspecting the particular persons stopped of criminal activity[.]" *Id.* (citing *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). "[W]hen evaluating the validity of detention, we must examine 'the totality of the circumstances—the whole picture.'" *Id.* at 416, 101 S.Ct. 690 (quoting *Graham v. State,* 325 Md. 398, 408, 601 A.2d 131 (1992)). Thus, when viewing the totality of the circumstances, officers must be able to point to specific and articulable facts that warrant the stop. *Id.* at 415, 765 A.2d 612. Conversely, the Court has consistently held that mere hunches are insufficient to justify an investigatory stop. *Id.*

 If the officer also has "an articulable basis for a reasonable belief that the suspect may be armed, the officer may 'frisk' him [or her] by conducting a pat-down of the exterior of the suspect's clothing to insure that he [or she] is not armed." *Weedon v. State,* 82 Md.App. 692, 696, 573 A.2d 92 (1990). That intrusion is reasonable under the Fourth Amendment, for the protection of the officer. *Id.* "The limited protective search as a preliminary to investigative questioning during a *Terry* stop is justified only by the officer's reasonable belief that the suspect is armed and dangerous." *Id.* at 699, 573 A.2d 92 (citing *Terry,* 392 U.S. at 24–27, 88 S.Ct. 1868). The frisk "requires its own independent justification, not only as to legitimacy but also as to scope." *Id.* at 698, 573 A.2d 92. However, "if the petitioner should not have been stopped in the first place, there certainly would not have, nor could there have been, any search." *Stokes,* 362 Md. at 410, 765 A.2d 612 (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441

(1963)) (initiating the doctrine that derivative evidence gained from the illegal actions of police must also be suppressed as fruits of poisonous tree); *see also Ott v. State*, 325 Md. 206, 600 A.2d 111 (1992) (noting that physical evidence obtained as the result of an illegal seizure is suppressed under the fruit of poisonous tree doctrine).

As a prelude to reaching the merits in *Terry v. Ohio*, the Supreme Court observed:

> Our first task is to establish at what point in this encounter the Fourth Amendment becomes relevant. That is, we must decide whether and when Officer McFadden "seized" Terry and whether and when he conducted a "search.". . . It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person. And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a "search."

392 U.S. at 16, 88 S.Ct. 1868.

Although it is not contested that the legal justification underpinning Officer Contrares' seizure of the person of appellant was a *Terry* stop pursuant to *Terry v. Ohio, supra*, Judge Wilner, writing for the Court of Appeals in *Collins*, 376 Md. 359, 829 A.2d 992, explained the sequential nature of a frisk *vis-à-vis* an investigative stop:

> We agree that the issue must be examined in a sequential sense, beginning with the initial accosting of Collins by Officer Jones. The Supreme Court first dealt, directly, with encounters of this kind in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which, among other things, the Court concluded that the governmental interest in crime prevention and detection justified the recognition "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is

no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906–07.

*Terry* and its immediate progeny involved investigatory stops where the police suspected the person of either being about to commit a crime, as in *Terry,* or in the course of committing a crime, which explains the Court's stressing of prevention and detection as the important governmental interest. In *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Court first considered the application of *Terry* to the accosting of an individual believed to have been involved in a completed crime. The balance of factors in that situation was somewhat different, in that a stop to investigate a completed crime does not promote the interest of crime prevention and detection and may not present the same kind of exigent circumstances as an effort to avert an imminent or ongoing crime. Nonetheless, the Court made clear that the police "are not automatically shorn of authority to stop a suspect in the absence of probable cause merely because the criminal has completed his crime and escaped from the scene." *Id.* at 228, 105 S.Ct. at 680, 83 L.Ed.2d at 611. *Rather, the ability of the police, even in the absence of probable cause, to stop a person suspected of involvement in a past crime, ask questions, or check identification strengthens the strong governmental interest in solving crimes and bringing offenders to justice.*

*Id.* at 366–67, 829 A.2d 992 (emphasis added).

■ Thus, although the exigency in an investigative stop for purposes of investigating potential or future crimes may be more heightened than that of a completed felony, in either case, it is important that an analysis of a *Terry* stop proceed sequentially from the initial accosting through the detention and frisk of the suspect. *Id.* at 19, 88 S.Ct. 1868. "[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19–20, 88 S.Ct. 1868.

## C

### *The Instant Case*

#### *i*

In the case *sub judice,* we begin with the information with which Officer Contrares was armed when he accosted appellant. The police radio broadcast reported that the robbery had been committed at 1:00 a.m. by several suspects, one of whom was on a bicycle, wearing dark clothing in the 6100 block of Eastern Avenue, Northeast, in the District of Columbia, approximately four blocks from where Officer Contrares was located in the 5700 block of Eastern Avenue. When he arrived at the 5700 block of Eastern Avenue, Officer Contrares testified that he and his partner saw "a group of subjects, about four of them, including a gentleman on a bike at the corner, standing at the corner of the 5700 block."

The broadcast informed that the robbery had been committed by "several suspects," but was nonspecific as to their descriptions. Undoubtedly, the fact that one of the suspects was wearing dark clothes and riding a bicycle attracted Officer Contrares' attention to the group. The Court of Appeals has held that, when looking at the totality of the circumstances to determine whether the State illegally effected a Fourth Amendment seizure, we use the facts as deemed credible by the trial judge. *State v. Lemmon,* 318 Md. 365, 378–79, 568 A.2d 48 (1990). As noted, the suppression hearing judge made no factual findings; thus, we look only to the evidence adduced at the hearing. In considering whether the circumstances that confronted them justified effectuating a *Terry* stop, the "reasonable suspicion" factors we apply are:

(1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspi-

cion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation. 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 195 (3d ed. 1996 & 2000 Supp.).

The Court of Appeals considered the "reasonable suspicion" factors in *Stokes, supra*. There, the officer heard a report of a robbery that had just occurred around 9:30 p.m. 362 Md. at 410, 765 A.2d 612. The police lookout contained no description of height, weight, method of escape, or any get-away vehicle, but simply described a black male wearing a dark top. *Id.* Approximately thirty minutes later, the officer saw a black man, wearing a black leather jacket, drive into a parking lot just around the corner from the scene of the robbery at a high rate of speed, park diagonally across lined parking spaces, and get out of his car. *Id.* The officer stopped the man, patted him down, and felt a bulge, which turned out to be a controlled substance. *Id.* at 411, 765 A.2d 612. The Court of Appeals, in reversing Stokes' conviction and in holding the frisk to be unlawful, reasoned that it would be highly unlikely that a robber who had as his mode of transportation a motor vehicle would remain in the immediate vicinity thirty minutes after the robbery. *Id.* at 425, 765 A.2d 612.

In *Cartnail,* in response to a police lookout for three black male robbery suspects, who had fled in an unknown direction in a gold or tan Mazda, an officer stopped Cartnail, a black male who was driving a gold Nissan and was accompanied by one black male passenger, approximately an hour and fifteen minutes after police received this information, and in close proximity to the robbery site. 359 Md. at 277–78, 753 A.2d 519. Cartnail was arrested and charged with driving on a suspended license. *Id.* at 278, 753 A.2d 519.

The Court of Appeals held that the arresting officer did not possess the reasonable articulable suspicion to justify a stop of Cartnail. 359 Md. at 296, 753 A.2d 519. In reaching that conclusion, the Court noted that the only factors in the police description that matched Cartnail were his gender, race, and "arguably the color of [his] car." *Id.* at 293, 753 A.2d 519.

Factors such as the car manufacturer and number of suspects, the Court said, "were too tenuously corroborated, or not corroborated at all, by [Cartnail's] circumstances." *Id.* Another factor considered by the Court was the area where Cartnail was stopped, because it was near two major highways and three other major roadways. In one hour and fifteen minutes, the Court said, "the suspects could have remained in the City of Frederick or just as easily fled in the intervening time to Frederick County or even other urban centers such as Hagerstown, Baltimore, Washington, D.C., Annapolis, or rural areas in Maryland, Virginia, West Virginia, or Pennsylvania." *Id.* at 295, 753 A.2d 519.

The Court of Appeals, in *Collins,* 376 Md. at 371–72, 829 A.2d 992, distinguished *Stokes* and *Cartnail* on the basis that, unlike the descriptions in those cases, the description of the robber in *Collins* was much more specific, including height, weight, type of clothing, and method of escape. Also factored in was that the range of flight for the robber was limited: Collins was spotted, on foot, within about fifteen minutes after the robbery, about 200 yards away, across one major highway. *Id.* at 372, 829 A.2d 992. The *Collins* Court further noted that, unlike Cartnail, Collins behaved in a way that aroused the officer's suspicions. *Id.* The officer, the Court concluded, was entirely justified in stopping Collins and asking questions designed either to confirm or dispel his reasonable suspicion that Collins might be the person who had just robbed the High's store. *Id.*

One of the factors that the Court relied upon in distinguishing *Stokes* and *Cartnail* from *Collins,* was the more specific description of the robber, including height, weight, type of clothing and method of escape. More importantly, however, was that Collins was spotted on foot, within fifteen minutes after the robbery and only approximately two hundred yards away. Similarly, appellant and his compatriots were also spotted just a short distance from where the robbery had taken place, mere minutes later. Although the only description in the police broadcast, "several individuals, one in

dark clothing, riding a bicycle," is not descriptive with respect to race, gender and color of clothing other than that the clothing of the cyclist was dark, the description takes on greater significance when considered against the setting, *i.e.*, at one o'clock in the morning.

The probabilities of coming upon a gathering, one of whom was riding a bicycle and wearing dark clothing as described in the police broadcast, a mere four blocks away from where the officers were located at one o'clock in the morning, are *de minimus*.[3] The fact that they were discovered, virtually immediately after the robbery, restricts the geographical area in which a group of individuals, one of whom was on a bicycle and the others on foot, would logically be found. One might presume that, at one o'clock in the morning, few people would be on the street. And, as noted by the Court of Appeals, in *Collins*, like Officer Contrares, because Collins acted in a way that aroused the officer's suspicions,[4] the officer was entirely justified in stopping Collins and asking questions designed either to confirm or dispel his reasonable suspicion that Collins might be the person who had just robbed the High's store. As will be discussed in greater detail, *infra*, it is the behavior of appellant which is the very quintessence of our analysis and

---

3. In *Cartnail,* the Court observed:

 It is of no surprise that courts place heavy weight on whether the stop of a suspect was accomplished *in the late evening or early morning hours, when fewer people are out in public,* as compared to the daylight or early evening hours when more people are out and about. 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 206 (3d ed.1996 and 2000 Supp.). The time of day can narrow the number of innocent people on the road and aid the police in honing in on criminal suspects.

 359 Md. at 295–96 (emphasis added).

4. It is worth noting, as will be discussed in greater detail, *infra*, that, although Collins' behavior when he was accosted, *i.e.*, darting into a telephone booth upon seeing the officer, then fleeing, may have aroused the officer's suspicion, 376 Md. at 370, 829 A.2d 992, such behavior, while tending to establish that Collins may have been involved in criminal activity does not constitute a *specific* reasonable basis that Collins may have been armed. Appellant's behavior, on the other hand, provided Officer Contrares with a specific and articulable belief that he may have been armed.

the fulcrum upon which our decision turns. Not to be disregarded, as well, was the flight from the scene of one of the other suspects.

According to Officer Contrares, when he and his partner alighted from the marked police vehicle, "[t]he individual on the bike kept going" and his partner "kept trying to catch up to the individual as [he] stayed with [appellant] and a couple more individuals at the scene." As Officer Contrares attempted to interview appellant, he had his hands in his pockets. Concerned, he said, for his safety, Officer Contrares "asked appellant to let [him] see his hands." Appellant, the officer said, "didn't respond to me; he didn't want to take his hands out of his.pocket, [that I may] see his hands. Once again, he denied my request." As Officer Contrares was asking appellant to take his hands out of his pocket so that he could see his hands, appellant "was kind of hesitant, kind of walking away from me looking back at me, . . . making furtive gestures and movements inside his pockets." It was at that point that Officer Contrares made the decision that he "need[ed] to make physical contact to get his hands out of his pocket, lay it against the vehicle, ask my partner to come back and assist me since I had three individuals with me and I was alone and conducted a pat-down, a protective patdown."

He further described appellant as appearing "very nervous after I asked him the second time . . . and he was also moving his hands inside his pockets, because I was looking at his hands." He added, "[a]t least [he] tried to" keep watch on appellant's hands, "because there was one of me and three of them." After Officer Contrares forcibly removed appellant's hands from his pockets and placed him against his police car, he conducted a frisk of appellant, finding a revolver inside of his right jacket pocket.

Appellant devotes five pages of his brief to the "level of suspicion" required to constitute reasonable articulable suspicion to support a "stop" that passes constitutional muster; only the last two pages, however, address the primary basis upon which the Supreme Court formulated the justification for

the "frisk" in its concept of a *Terry* stop. He acknowledges the holding in *Terry* that, "if the officer observes conduct that leads him to conclude that the suspects with whom he is dealing are presently armed and dangerous, the officer may undertake 'a carefully limited search of outer clothing of such persons in an attempt to discover weapons which might be used to assault him.'" *See Terry,* 392 U.S. at 30, 88 S.Ct. 1868. Yet, he fails to address whether the testimony of Officer Contrares regarding his concerns about appellant's refusal to display his hands and his furtive moves "was a reasonable basis for Contrares to conclude that appellant might be armed and dangerous." The extent of his legal argument, in *toto,* is simply, ". . . he (Officer Contrares) did not have the requisite reasonable, articulable suspicion to believe that he was armed."

Although appellant has not focused on the determinative issue in this appeal, the reasonable articulable suspicion for the initial stop, in our view, is not irrelevant to our analysis. In determining whether the seizure of the person and search were unreasonable, our inquiry is "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. 1868. Where the purpose of the stop is simply to investigate suspicious circumstances in which it is not known whether a crime has, in fact, been committed, the scope of the permissible intrusion is more limited than circumstances when there is greater certitude as to whether there was—or is—criminal activity afoot. Where, as here, the officers were conducting an investigation of a robbery that had just occurred, the circumstances justified Officer Contrares' interference with appellant's personal security. More specifically, the officer's purpose in accosting appellant and his companions was to question them about the robbery and either confirm or dispel whether they had been involved or had information about the robbery.

When the officer accosted appellant, he could have responded in several ways. Officer Contrares, in turn, was

constrained to react in accordance with appellant's response.[5] Had appellant either cooperated with the officer by responding to his questions or simply declined to answer questions put to him and walked away, our review would have then focused on the officer's actions in light of the circumstances which justified the stop in the first place. Those circumstances, of course, would be measured against the reasonable, articulable suspicion standard.

We pause to consider at what point the levers of appellant's Fourth Amendment challenge are engaged. Patently, appellant's person was "seized" when Officer Contrares made "physical contact to get his hands out of his pocket." "[T]he use of language or tone of voice indicating that compliance with the officer's request might be compelled," has been held, in certain contexts, to constitute restriction of one's freedom of movement and, hence, a seizure. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870.[6] Under the latter test, Officer Contrares'

---

5. Reasonable suspicion of criminal activity warrants a temporary seizure for questioning limited to the purpose of the stop. *Nathan v. State,* 370 Md. 648, 660, 805 A.2d 1086 (2002) (citations omitted). A detainee is not obligated to respond, however, and, "unless the detainee's answers provide the officer with probable cause to arrest him, he must be released." *Berkemer,* 468 U.S. at 439–40, 104 S.Ct. 3138. When a suspect voluntarily stops in a cooperative manner and remains free to walk away, a seizure has not occurred unless signs of force or weapons are shown to have effectuated the stop. *Jones,* 319 Md. at 282–83, 572 A.2d 169 (citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). A police officer may direct an inquiry to a citizen, even when the officer has no cause for doing so, and it may be entirely appropriate for that citizen to decline "to stop or respond to such inquiries." *Stokes,* 362 Md. at 414, 765 A.2d 612 (citing *Anderson,* 282 Md. at 708, 387 A.2d 281). Under the Fourth Amendment, the officer may make a forcible stop of a citizen if the officer has reasonable grounds for doing so. *Stokes,* 362 Md. at 414–15, 765 A.2d 612 (citations omitted).

6. In defining the scope of what constitutes a seizure under the Fourth Amendment, the Court adopted a totality of the circumstances approach and recognized that a person has been seized if a reasonable person would have believed that he was not free to leave. Examples of situations indicating a seizure, even when the person did not attempt to leave, include the " '(1) threatening presence of several officers, (2) the display of a weapon by an officer, (3) some physical touching of the person of the citizen, or (4) the use of language or tone of voice

demand that appellant remove his hands from his pockets would have constituted seizure of appellant's person. We need not be concerned with which of these two acts triggered Fourth Amendment review. We explain.

The issue before us on this appeal, properly framed, is whether Officer Contrares' attempt to subject appellant to "a moderate number of questions to dispel the circumstances that provoke[d] suspicion" were unreasonable in light of the scope of the investigation of a robbery which had just occurred four blocks from where the officers received the radio broadcast. And, assuming the reasonableness of Officer Contrares' attempt to initiate questioning of appellant about his involvement in or knowledge of the robbery, whether the circumstances warranted first requesting appellant to "let me see his hands" to discover whether appellant was armed to ensure his safety.

A governmental interest was vested in Officer Contrares' conduct of a *Terry* stop of appellant in furtherance of "effective crime prevention and detection," which "underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibl[e] criminal behavior even though there is no probable cause to make an arrest." *Terry,* 392 U.S. at 22, 88 S.Ct. 1868

In *Terry,* the investigating officer had nothing more than suspicious circumstances: two men paced alternately along an identical route, peering in a store window approximately twenty-four times, followed immediately by a conference on the corner, where they were followed by a third man who left swiftly and the two men followed the third and rejoined him several blocks away. 392 U.S. at 6–7, 88 S.Ct. 1868. The Court described these as a series of acts, as "each of them

indicating that compliance with the officer's request might be compelled.' " *Jones,* 319 Md. at 283, 572 A.2d 169 (quoting *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870). The significant point of this approach focuses upon what an individual reasonably believes as a result of police conduct towards him. *Id.* at 283, 572 A.2d 169.

perhaps innocent in itself, but which taken together warranted further investigation." *Id.* at 22, 88 S.Ct. 1868. While acknowledging that there was no probable cause to make an arrest as a result of this behavior, the Court concluded, "It would have been poor police work indeed for an officer of [thirty] years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." *Id.* at 23, 88 S.Ct. 1868.

Moreover, the Court of Appeals, in *Collins,* quoting *United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), opined:

Restraining police action *until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large.* Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible. The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes.

376 Md. at 367–68, 829 A.2d 992 (emphasis added).

Armed with the knowledge that a robbery had just been committed, as opposed to "the possible criminal behavior" observed in *Terry,* it would not have been a faithful discharge of Officer Contrares' duties as a police officer had he not acted in a manner that would allow him to proceed with his investigative interview of appellant relative to the robbery. Preliminary to questioning appellant, the officer was constrained to neutralize what he perceived to be a threat to his personal safety. *See Weedon v. State,* 82 Md.App. 692, 699, 573 A.2d 92 (1990) (holding that "[t]he limited protective search *as a preliminary* to investigative questioning during a *Terry* stop is justified only by the officer's reasonable belief that the suspect is armed and dangerous") (citing *Terry,* 392 U.S. at 24–27, 88 S.Ct. 1868) (emphasis added).

Appellant quite correctly posits that "the right to stop a person does not automatically confer upon the police the right to conduct a pat-down search for weapons." He relies on the factors in determining reasonable articulable suspicion articulated by Professor LaFave and applied in *Cartnail*, 359 Md. 272, 753 A.2d 519, and *Stokes*, 362 Md. 407, 765 A.2d 612, *supra*, which are only relevant in a determination of whether a *Terry* stop is justified. At the outset of our analysis, we noted the importance of examining the police-citizen confrontation "in a sequential sense, beginning with the initial accosting" of the suspects. *Collins*, 376 Md. at 366–67, 829 A.2d 992. Sequentially, in the case at hand, after a robbery occurred, Officer Contrares approached appellant and, in his words, "[a]s [he] tried to interview the [appellant], he had his hand in his pocket." It is beyond cavil that, applying the LaFave factors, a *Terry* stop was warranted. *Terry* and its progeny allow a police officer who perceives that a detainee is armed and dangerous to conduct a protective search *as a preliminary* to investigative questioning as a proactive measure. What cannot be overlooked in our determination of whether the circuit court erred in denying appellant's motion to dismiss is the fact that Lorenzo C. was found involved in the illegal possession of a handgun. The unlawful act was thus uncovered and, hence, probable cause was extant upon the frisk of appellant and the recovery of the handgun from the right pocket of his jacket. Appellant's reliance on *Stokes, supra, Jones, supra* and *Cartnail, supra*, is misplaced because, unlike the police-citizen encounter in this case, the focus was on the existence, *vel non*, of reasonable articulable suspicion *to stop* the suspects in those cases.

Indeed, appellant, in the case *sub judice*, all but concedes that Officer Contrares was justified in stopping him, asserting that, "[e]ven assuming *arguendo* that Contrares was justified in stopping [him], the officer did not have the requisite reasonable and articulable suspicion to frisk him." Appellant's furtive movements and refusal to permit Officer Contrares to see his hands occurred when appellant was initially accosted and before any questioning began. Sequentially, then, it is

not contested that Officer Contrares properly accosted appellant for the purpose of conducting investigative questioning about a robbery that had just occurred. Nor does appellant either credibly argue that Officer Contrares' testimony that appellant's furtive moves were insufficient to support his perception that appellant was armed and dangerous or that the officer's testimony defied credulity. Thus, sequentially, Officer Contrares' lawful accosting for the purpose of investigative questioning relative to a robbery that had just occurred ripened seamlessly into the circumstances justifying the frisk of appellant. In other words, appellant's actions gave rise to the exigency that required Officer Contrares to effectuate the pat-down before he had an opportunity to question appellant as to whether he and his companions were involved.[7]

As the *Terry* Court observed,

When an officer is justified in believing that the individual whose suspicious behavior he is investigating *at close range* is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

392 U.S. at 24, 88 S.Ct. 1868 (emphasis added).

The propagating force in the development of the procedure for insuring officer safety, in *Terry*, was the necessity that officers be allowed to investigate possible criminal activity on the street without being vulnerable to citizens carrying concealed weapons. Where, as here, the exigency created by

---

7. The *Terry* Court, in response to petitioner's contention that police officers are not justified in searching a suspect to discover weapons until "such time as the situation evolves to a point where there is probable cause to make an arrest," held that the petitioner's proposition failed to take into account that there is "no distinction in purpose, character, and extent between a search incident to arrest and a limited search for weapons." 392 U.S. at 25, 88 S.Ct. 1868. The Court, however, hastened to add that "[a] search for weapons in the absence of probable cause to arrest, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." *Id.* at 25–26, 88 S.Ct. 1868 (citation omitted).

appellant's actions occurred prior to any seizure implementing the Fourth Amendment, the seizure, under *Terry,* is warranted when the officer reasonably believes that the detainee is armed and dangerous. The Fourth Amendment intrusion to which appellant was subjected was warranted by the circumstances that justified the interference in the first place—the public interest in investigating the robbery which had just been committed. The accosting and stop and frisk of appellant pursuant to *Terry* did not violate his Fourth Amendment rights against unreasonable search and seizure.

*ii*

To summarize, a police officer may conduct a patdown of the exterior of a suspect's clothing to insure that he or she is not armed if (1) the officer is able to point to specific and articulable facts that warrant the stop and (2) the officer has an articulable basis for a reasonable belief that the suspect may be armed. Having determined that reasonable articulable suspicion properly factored into our analysis only as to the circumstances which justified his initial stop of appellant, we shall not tarry long in addressing whether the evidence demonstrated reasonable articulable suspicion to believe that appellant was armed. We may only look to the testimony of Officer Contrares, since his account of appellant's actions was not contradicted and the court failed to make any factual findings or determinations as to credibility.

As noted, appellant makes a bald assertion that Officer Contrares did not have a reasonable belief that appellant was armed, without any comment on the evidence. The officer specifically testified that, as he attempted to initiate his interview of appellant, "for officer safety," he asked him to "let me see his hands." After appellant again refused to remove his hands from his pockets, the officer described appellant as "hesitant, kind of walking away from me, looking back at me, making furtive gestures in his pocket." It is also significant that the officer alluded to the fact that his partner had pursued the suspect on a bicycle, leaving Officer Contrares to maintain control over three individuals. Although virtually all

*Terry* stops involve dealing with potentially armed suspects *at close range, id.* at 24, 88 S.Ct. 1868, this factor is particularly salient where, as here, the officer is outnumbered three to one. In light of appellant's hesitant behavior and his action in looking over his shoulder, it was not unreasonable for the officer to be apprehensive about what appellant was contemplating. Furthermore, Officer Contrares and his partner were investigating a robbery—a crime of violence, which had just been committed. Finally, it was one o'clock in the morning, which did not bode well for citizen assistance or witnesses in the event appellant and his two companions attempted to overpower Officer Contrares. There was, in our view, sufficient evidence as to the reasonableness of Officer Contrares' belief that appellant was armed and posed a threat to his safety.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, SITTING AS THE JUVENILE COURT, AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**